**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DORIS MILLER,

> *Petitioner-Appellee,*

v.                                              No. 99-2630

WILLIAM MILLER,

> *Respondent-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, District Judge.
(MISC-99-54-3-V)

Argued: December 5, 2000

Decided: February 16, 2001

Before WIDENER and KING, Circuit Judges, and
William L. GARWOOD, Senior Circuit Judge of the
United States Court of Appeals for the Fifth Circuit,
sitting by designation.

---

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Widener joined. Senior Judge Garwood wrote an opinion
concurring in the result.

---

## COUNSEL

**ARGUED:** Patricia Emily Apy, PARAS, APY, REISS, P.C., Red
Bank, New Jersey, for Appellant. Christian Riley Troy, HELMS,
CANNON, HENDERSON & PORTER, P.A., Charlotte, North Caro-

lina, for Appellee. **ON BRIEF:** A. Marshall Basinger, II, Charlotte, North Carolina, for Appellant. Thomas R. Cannon, Sheila G. Passenant, HELMS, CANNON, HENDERSON & PORTER, P.A., Charlotte, North Carolina, for Appellee.

## OPINION

KING, Circuit Judge:

William Miller ("Miller") appeals from the decision rendered against him in the Western District of North Carolina ordering the return of his infant children to Canada in the custody of their mother, Doris Miller ("Ms. Miller"). *See* Memorandum and Order of November 4, 1999 ("District Court Order"). The district court proceeded under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610, which implements the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501. We affirm the district court.

I.

In August 1998, Miller forcibly removed the children from their mother's home in St. Catharines, Ontario, Canada, and brought them into the United States to settle with him in Charlotte, North Carolina. Ms. Miller filed this action pursuant to ICARA and the Hague Convention,[1] seeking the children's return on the ground that they were illegally abducted by Miller in violation of a valid Canadian custody order.

A.

The essential facts underlying this dispute are spelled out in the District Court Order. Ms. Miller is a citizen and resident of Canada, while Miller is a citizen and resident of the United States. The parties'

---

[1]Both the United States and Canada are signatories to the Hague Convention.

elder child, Hope Christian Miller, was born in Canada in September 1990. The parties subsequently married in 1993 and separated in 1995, prior to the birth of the younger child, Faith Kendra Taylor Irwin Miller, who was born in Canada in August 1995. They have since divorced.

An Ontario court, in an October 3, 1997 decree ("Ontario Order"), granted permanent custody of the children to Ms. Miller. On August 28, 1998, Miller arrived in Canada — ostensibly for the purpose of exercising his rights of supervised visitation under the Ontario Order — and, without Ms. Miller's consent, took the children from her home and returned with them to the United States.[2] The district court found that "[b]ased on the amount of time during which the children lived in Canada during the course of their respective lives, the children were habitually resident in Canada as of August 28, 1998." District Court Order, at 4.[3] Moreover, the court determined that Ms. Miller filed her Hague Convention petition less than one year after the children were taken to the United States,[4] and that Hope and Faith had not become settled in North Carolina within the meaning of the Hague Convention. Finally, the court ascertained that the return of the children to Ms. Miller did not "pose a grave risk to the health, safety, and well-being of the children as defined by the Convention." *Id.*

---

[2]Ms. Miller maintained, in an affidavit to the district court: "That day Mr. Miller and another man came to my home, assaulted me, and abducted Hope and Faith." J.A. 183.

[3]Ms. Miller submitted, as evidence before the district court, declarations regarding the past residences of the children. According to these declarations, Hope resided, as of August 1993, in New York with both parties; as of December 1994, with Ms. Miller in Canada; as of April 1995, under a shared custody arrangement, with Ms. Miller in Canada and with Miller in New York; and, as of December 1995 until her removal in August 1998, with her mother in Canada. Prior to her removal, Faith always lived in Canada with Ms. Miller.

[4]The court erroneously recounted the date of the petition as August 20, 1998. The petition actually was filed on August 23, 1999. The court was correct, however, in finding that the action was commenced less than one year after the children's removal from Canada.

### B.

This case is complicated by a series of conflicting custody orders issued by courts in both New York State and Ontario, both before and after the children were taken by Miller to North Carolina. The custody battles began in spring 1995 in a New York family court.[5] Ms. Miller then filed a custody petition in October 1995 in Ontario. The parties each intermittently appeared in — and failed to appear in — both the New York and Ontario courts. They each were admonished for violating various orders, including mandates regarding visitation rights and payment of child support.

Subsequent to the Ontario Order of October 3, 1997, the New York court awarded custody of the children to Miller in a March 28, 1998 decree ("New York Order").[6] In granting this relief, the New York family court noted that Ms. Miller had last appeared in person in September 1997, although counsel had appeared on her behalf.[7] The court determined that "[g]iven Mrs. Miller's failure to appear and to testify on her own behalf, this Court is permitted to draw, and has drawn the strongest inference against her that the evidence permits." New York Order, at 3 (citation omitted). The court then concluded, based on various findings of fact, that "Mrs. Miller's actions demonstrate a fundamental defect in her understanding of the duties of parenthood." *Id.* at 10 (citation and internal quotation marks omitted).

---

[5]It appears from the record that Miller initially filed a petition for custody of Hope and of Faith (then unborn) in New York in March 1995, while the parties were separated. *See* J.A. 130 (June 18, 1999 order of Court of Appeal for Ontario); J.A. 182 (November 3, 1999 affidavit of Ms. Miller). Ms. Miller thereafter, in May 1995, initiated divorce proceedings in New York. *See* J.A. 28 (April 22, 1998 order of New York family court).

[6]The New York family court, on February 6, 1998 — again, subsequent to the Ontario Order — issued a temporary order awarding custody of Hope and Faith to Miller, with rights of supervised visitation in New York for Ms. Miller. Prior to this temporary order, Miller never had sole custody rights under any court order in New York. In fact, since December 1995, Miller had been entitled only to visitation.

[7]Though properly served, Miller did not appear — in person or by counsel — for proceedings in Canada that resulted in the Ontario Order and a preceding temporary custody order in Ms. Miller's favor.

Before removing the children from Canada, Miller twice asked Ontario courts to set aside the Ontario Order in favor of the New York Order. Although his first request was rejected, his second, substantially identical entreaty was granted on September 1, 1998, a few days after he removed the children to the United States. However, the Ontario Order was reinstated in a June 18, 1999 order by the Court of Appeal for Ontario ("Ontario Court of Appeal Order"). The court of appeal first determined that, in recognizing the New York Order, the lower court had misapplied Canadian law regarding the recognition of a foreign custody judgment. The court of appeal also concluded that

> [w]hatever rights the husband may have had by reason of the [New York Order] or otherwise, he had no right either to assault his wife or to abduct the children. In our view, his conduct should have been condemned by the application judge in the strongest possible terms. Whatever the faults of the wife, the husband had to be made aware that his objectives could not be achieved by violence or other unlawful conduct. To consider his application in the circumstances, was to approbate his conduct. . . .
>
> The application judge expressed his "most sincere hope that upon learning of the outcome of these proceedings the father will return to the Niagara Falls area and will allow the children to visit with their mother." That hope has not been realized.
>
> In our view, the application judge should have refused to consider the application of the husband until the children were returned to the custody of their mother. In our opinion that is still the appropriate position of the court.

Ontario Court of Appeal Order, at 6. Notably, the court of appeal welcomed the parties to further litigate the custody issue once the children were returned to Canada. Subsequent to this decree, however, the New York family court issued a modifying order allowing Miller to retain custody of Hope and Faith and relocate with them to North Carolina. This modifying order was issued on August 16, 1999,

nearly a year after Miller had absconded to North Carolina with the children.

### C.

Ms. Miller filed this action pursuant to the Hague Convention, T.I.A.S. No. 11,670, 19 I.L.M. 1501, as implemented in the United States by ICARA, 42 U.S.C. §§ 11601-11610. The petition was initially submitted to the United States District Court for the Western District of New York on August 23, 1999. The action was thereafter transferred to the Western District of North Carolina, where venue properly lies. *See* § 11603(b) (permitting Hague Convention petitions to be filed "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed").

The district court treated Ms. Miller's petition as an application for a writ of habeas corpus. *See, e.g.*, *Zajaczkowski v. Zajaczkowska*, 932 F. Supp. 128 (D. Md. 1996). Notice of the proceeding was properly given to the parties, *see* § 11603(c), and, as we explain below, the case was appropriately determined by the district court in accordance with the Hague Convention, *see* § 11603(d).

### II.

### A.

In adopting the Hague Convention, the signatory nations sought "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, pmbl., T.I.A.S. No. 11,670, at 2, 19 I.L.M. at 1501. That is, the primary purpose of the Hague Convention is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*"). Consequently, the scope of a court's inquiry under the Hague Convention is limited to the merits of the abduction claim. *See* 42 U.S.C. § 11601(b)(4). As the district court

correctly recognized in this action, "The merits of any underlying custody case are *not* at issue." District Court Order, at 3 (emphasis added); *see also Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64 (6th Cir. 1996) ("*Friedrich II*").

In this case, Ms. Miller, as petitioner, was required to establish, by a preponderance of the evidence, that her children were "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). Thus, Ms. Miller had to prove that: (1) the children were "habitually resident" in Canada at the time Miller removed them to the United States; (2) the removal was in breach of Ms. Miller's custody rights under Canadian law; and (3) she had been exercising those rights at the time of removal. *See* Hague Convention, art. 3, T.I.A.S. No. 11,670, at 2, 19 I.L.M. at 1501.[8]

Upon substantiation by Ms. Miller that removal of her children from Canada was wrongful, Hope and Faith's return was required unless Miller, as respondent, established one of four available defenses. *See* § 11603(e)(2)(A) (requiring proof, by clear and convincing evidence, that one of the exceptions set forth in article 13b or 20 of the Hague Convention applies); § 11603(e)(2)(B) (commanding proof, by a preponderance of the evidence, that some other exception set forth in article 12 or 13 of the Hague Convention applies). In order

---

[8]This article defines a "wrongful" removal or retention of a child as one where:

    a   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

    b   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3, T.I.A.S. No. 11,670, at 2, 19 I.L.M. at 1501.

to prevail, therefore, Miller could show, by clear and convincing evidence, that: (1) there was a grave risk that the children's return to Ms. Miller would expose them to physical or psychological harm or otherwise place them in an intolerable situation, *see* Hague Convention, art. 13b, T.I.A.S. No. 11,670, at 4-5, 19 I.L.M. at 1502, or (2) the return of the children to Canada would not be permitted by the fundamental principles of the United States "relating to the protection of human rights and fundamental freedoms[,]" Hague Convention, art. 20, T.I.A.S. No. 11,670, at 5-6, 19 I.L.M. at 1503. Miller also could prevail if he established, by a preponderance of the evidence, that: (1) this action was not commenced within one year of the abduction, and the children were *now* well-settled in North Carolina, *see* Hague Convention, art. 12, T.I.A.S. No. 11,670, at 4, 19 I.L.M. at 1502, or (2) that Ms. Miller "was not actually exercising the custody rights at the time of removal . . . or had consented to or subsequently acquiesced in the removal[,]" Hague Convention, art. 13a, T.I.A.S. No. 11,670, at 4, 19 I.L.M. at 1502.

Because of the competing New York and Ontario custody orders in this case, it is significant to recognize that "the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence." *Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997). Thus, upon establishment of Canada as the children's "habitual residence," the mere existence of the New York Order granting permanent custody of the children to Miller was not in itself a defense for wrongful removal, though it would be an appropriate — albeit discretionary — judicial exercise to "take account of the reasons" for that decree in appraising the merits of this abduction claim. *See* Hague Convention, art. 17, T.I.A.S. No. 11,670, at 5, 19 I.L.M. at 1503.[9]

---

[9]Article 17 of the Hague Convention provides, in full, the following:

> The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State [here, the United States] shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

Hague Convention, art. 17, T.I.A.S. No. 11,670, at 5, 19 I.L.M. at 1503.

B.

After setting forth its findings of fact, *see supra* Part I.A, the district court concluded that Miller's removal of Hope and Faith to the United States was a breach of Ms. Miller's custody rights under the law of Canada, which was the habitual residence of the children at the time of their abduction. Thus, the court determined, Miller's "removal of the children from Canada was wrongful and his present retention of them in the United States is wrongful." District Court Order, at 5. Moreover, the court concluded that the defenses raised by Miller were inapplicable in this action. Accordingly, the court ordered that the children be placed in Ms. Miller's custody for their return to Canada, and that law enforcement officers provide any necessary assistance to ensure a safe homecoming. That order was carried out and the children returned to Canada with their mother.

III.

In an action pursuant to ICARA and the Hague Convention, we review the district court's findings of fact for clear error, while its conclusions regarding principles of domestic, foreign, and international law are reviewed by us de novo. *See Friedrich II*, 78 F.3d at 1064 (citing Fed. R. Civ. P. 44.1) (other citations omitted); *accord Shalit*, 182 F.3d at 1127.

IV.

On appeal, Miller asserts that the district court erred in concluding (1) that Ms. Miller proved the wrongful removal of her children from Canada, within the meaning of the Hague Convention, and (2) that Miller failed to establish any of the four available defenses. We address these arguments in turn.

A.

First, Miller insists that because he had been granted permanent custody of the children pursuant to the New York Order of March 24, 1998, the district court erred in concluding that Canada was the "habitual residence" of the children as of August 28, 1998 (the day he

removed them to the United States) and that Ms. Miller was exercising valid custody rights under Canadian law on that day.

1.

The Hague Convention does not define "habitual residence." However, in ascertaining how to make this determination, we are guided by the precedent of our sister circuits in concluding that "there is no real distinction between ordinary residence and habitual residence." *Friedrich I*, 983 F.2d at 1401 (citing *In re Bates*, No. CA 122.89, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989)); *accord Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995). As the Sixth Circuit explained: "A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." *Friedrich I*, 983 F.2d at 1401. This is a fact-specific inquiry that should be made on a case-by-case basis. *See id.* (citing *Bates*). Moreover, of potential import in this action, a parent cannot create a new habitual residence by wrongfully removing and sequestering a child. *See Diorinou v. Mezitis*, No. 00-9501, 2001 WL 20835, at *7 (2d Cir. Jan. 9, 2001) (citations omitted).

In this case, the evidence shows that both children were born in Canada and resided there with their mother for a substantial portion of their lives — in Faith's case, for her entire life — until they were removed by their father to the United States. Accordingly, the district court determined that the children's habitual residence at that time was Canada. Miller maintains that this was error and that the United States was their habitual residence, because Ms. Miller wrongfully retained the children in Canada as of March 24, 1998, in violation of the New York Order. (Miller does not, however, appear to dispute the evidence as to the amount of time the children lived in Canada nor assert that their Canadian residence began as a result of Ms. Miller wrongfully moving them there.)

Because Miller's argument presumes that the New York Order superseded the earlier Ontario Order granting custody of the children to Ms. Miller, we turn to the Ontario Court of Appeal Order upholding this custody award in the face of the New York Order. *See Diorinou*, 2001 WL 20835, at *7-8 (in Hague Convention action

where father insisted children were not habitual residents of Greece because mother had wrongfully retained them there, the Second Circuit looked to prior Hague Convention action between same parties in which Greek courts concluded that children's retention in Greece was not wrongful).[10] In determining the amount of deference due to the Canadian decision, we acknowledge that "judgments rendered in a foreign nation are not entitled to the protection of full faith and credit." *Id.* at *8 (quoting Restatement (Second) of Conflict of Laws § 98 cmt. b (1971)). We note, however, that "American courts will normally accord considerable deference to foreign adjudications as a matter of comity." *Id.* (citations omitted). Indeed, "comity is at the heart of the Hague Convention." *Id.* (citations and internal quotation marks omitted).

After reviewing the complex history of litigation in this case, the Ontario Court of Appeal upheld the validity of the Ontario Order — at least pending further proceedings — and denied recognition of the New York Order based on Canadian conflict of law principles.[11] In

---

[10]Miller asks us, instead, to look to the New York Order. He contends that, under the full faith and credit provisions of the Parental Kidnapping Prevention Act ("PKPA"), 28 U.S.C. § 1738A, the New York Order supersedes the Ontario Order. Miller's reliance on the PKPA is misplaced, however, because it applies only to determinations by courts within the United States and its territories.

[11]Our distinguished colleague Judge Garwood, in his concurring opinion, maintains that the Ontario Court of Appeal merely sought to restore the pre-removal status quo without concluding that Ms. Miller was ultimately entitled to custody. Moreover, he says that "[t]he court of appeal cast no doubt on the trial court's September 1, 1998 finding that Doris Miller 'flagrantly has been holding the children in direct contravention of a [March 28, 1998] court order issued by a Niagara Falls, New York court,' in the proceeding which Doris Miller instituted, awarding custody to William Miller." *Post*, at 17. With all respect to our good friend, we perceive the circumstances somewhat differently, for three reasons.

First, the court of appeal's decision was based not only on its objective to restore the status quo, but also on its conclusion that the lower court committed legal error in applying Canadian conflict of law principles. Thus, it does not follow that the court of appeal agreed with the lower court that Ms. Miller was "flagrantly" defying the foreign judgment.

light of this reasonable disposition, we see no reason not to defer to the court's decision. Therefore, we reject Miller's contentions that Ms. Miller wrongfully retained the children in Canada upon issuance of the New York Order.[12] Furthermore, we agree with the district court that Canada was the children's "habitual residence" at the time Miller absconded with them to the United States.

2.

Miller's related argument — that, because of the New York Order, Ms. Miller was not exercising valid custody rights on August 28, 1998 — similarly fails. Indeed, because we agree that Canada was the children's "habitual residence" for purposes of the abduction claim, we look to Canadian law to determine whether Ms. Miller was exercising valid custody rights in that country at the time of the children's removal. *See Friedrich I*, 983 F.2d at 1402 ("Under the Convention, whether a parent was exercising lawful custody rights over a child at the time of removal must be determined under the law of the child's habitual residence." (citation omitted)); *Shalit*, 182 F.3d at 1128-29 (holding that this determination "is not limited to internal or domestic

Second, at most, the court of appeal left open the possibility that Miller might later be found to have custody rights under the New York Order. *See* Ontario Court of Appeal Order, at 6 ("*Whatever* rights the husband *may* have had by reason of the [New York Order] or otherwise . . . ." (emphasis added)). Indeed, the court of appeal observed that the parties could elect to pursue further custody determinations in Canada once the children were returned there — precisely the result allowed by the district court's decision in this Hague Convention action.

Third, it is unclear that it was Ms. Miller — rather than Miller — who initiated the custody proceedings in New York. *See supra* note 5. We doubt, however, the relevance of this detail to our limited inquiry under the Hague Convention, though it might be pertinent in any future proceedings in other, appropriate courts concerning the underlying merits of this unfortunate dispute.

[12]Even if we agreed with Miller that his ex-wife wrongfully retained the children in Canada in violation of the New York Order, it would not necessarily follow that the children's habitual residence was the United States.

law but includes the conflict of law rules of the state of habitual residence").

As previously discussed, the Ontario Court of Appeal — by all accounts, a competent judicial body — determined that Ms. Miller was entitled to custody of Hope and Faith, despite the New York Order to the contrary. Miller failed to provide any authority from Canada undermining this decision or any other reason to question the Ontario court's interpretation of the law of its own country. Thus, we are compelled to agree with the district court that Ms. Miller was exercising valid custody rights in Canada when her children were removed from that country.[13]

---

[13]Moreover, the Hague Convention was intended to give priority to a custody decision issued in Canada, as the country of habitual residence, *see Ohlander*, 114 F.3d at 1541, and the sole fact that a custody decision was rendered in New York is not in itself a ground for refusing to return the children to Canada, *see* Hague Convention, art. 17, T.I.A.S. No. 11,670, at 5, 19 I.L.M. at 1503. Furthermore, during the district court hearing on November 4, 1999, Miller's counsel conceded that Miller had *no* valid order from any court allowing him to remove the children from Canada to the United States without Ms. Miller's consent.

> I think the only thing petitioner [Ms. Miller] can really argue is we maintain a fallacious argument and that is that when my client went to Canada in August of 1998 to visit his children, he took them and he brought them across the line to — border to Buffalo and at that time he and his mother had moved to Charlotte and brought them on down here and that that was a wrongful removal, and I've already expressed our position that we don't contend that's a wrongful removal under the statute, but *obviously he did not have an order of the Canada court — or an order of the United States court in his hand that says you can go in the house and you can take the children and bring them back* . . . .
>
>     . . . .
>
> [P]etitioner would argue to the court that although his taking the children may be a technical trespass or violation of some Canadian law, which I understand there's some warrants outstanding for him, that that is likewise a wrongful removal under Hague. And I submit to Your Honor that common sense dictates that that is not what is intended by Hague.

B.

Next, Miller asserts that he established two defenses that should have prevented the reunion of Hope and Faith with their mother in Canada — that the return posed a grave risk of harm to the children, and that they had been well-settled in North Carolina.[14] As addressed in Part II.A, *supra*, the defense of "grave risk" must be proven by clear and convincing evidence. As with each of the other three exceptions, this defense is a narrow one. *See* 42 U.S.C. § 11601(a)(4); *Friedrich II*, 78 F.3d at 1067 (instructing that these defenses "are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute"). In fact, "the courts retain the discretion to order return even if one of the exceptions is proven." *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995) (citing Pub. Notice 957, 51 Fed. Reg. 10,494, 10,509 (1986)). As the Sixth Circuit explained with respect to the "grave risk" exception in particular:

> "In thinking about these problems, we acknowledge that courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly. . . . When we trust the court system in the abducted-from country, the vast majority of claims of harm — those that do not rise to the level of gravity required by the Convention — evaporate.

J.A. 201-03 (emphasis added). These assertions about "common sense" aside, the Hague Convention is clearly intended to prevent exactly what occurred in this case: "self-help," or "the law of grab and run."

[14]The latter of these two exceptions — the "well-settled" defense — has no application here. As discussed in Part II.A, *supra*, this defense requires proof by a preponderance of the evidence that the Hague Convention action was not commenced within one year of the abduction *and* that "the child is now settled in its new environment." Hague Convention, art. 12, T.I.A.S. No. 11,670, at 4, 19 I.L.M. at 1502. In this case, the petition was filed within a year of the wrongful removal.

*Friedrich II*, 78 F.3d at 1068 (internal citation omitted).

In this case, Miller asserts that the district court was required to adopt the factual findings in the New York Order with regard to Ms. Miller's parental fitness and, accordingly, should have declined to return the children to her under the "grave risk" exception. Such deference to the New York family court was not, in fact, required, though the district court possessed discretion to "take account of the reasons" for the New York Order in appraising the merits of Miller's asserted defense. *See* Hague Convention, art. 17, T.I.A.S. No. 11,670, at 5, 19 I.L.M. at 1503. The findings of fact in the New York Order — if true — raise serious questions about Ms. Miller's fitness to raise Hope and Faith. However, we recognize that the family court drew the strongest inferences against her that the evidence permitted, due to her decision not to testify in her own behalf or even attend the New York proceedings following issuance of the Ontario Order. Without more evidence than the findings in the New York Order, we agree with the district court that Miller failed to meet his burden in proving the "grave risk" defense. *See Diorinou*, 2001 WL 20835, at *11 (where competing custody decrees were issued in New York and Greece, the Second Circuit endorsed the district court's refusal to enforce the order from the abducted-to country (the United States) because it resulted from "a one-sided and defective presentation" (citation omitted)). Moreover, we are confident that if Ms. Miller truly poses a danger to her children, the Ontario courts are ready and able to take every step to protect them. *See* Ontario Court of Appeal Order, at 6 (remarking that "the parties are entirely free to request" a full hearing of the custody question).

V.

Pursuant to the foregoing, we agree with the district court's disposition of this dispute. We therefore affirm the court's ruling, as embodied in its Memorandum and Order of November 4, 1999.

*AFFIRMED*

GARWOOD, Senior Circuit Judge, concurring in the result:

Despite Judge King's cogent opinion, I remain troubled by this case.

It is abundantly clear that appellee Doris Miller has willfully flouted the valid orders of the New York court issued in the divorce proceedings she instituted there against appellant William Miller, including unappealed orders awarding custody of the children to William Miller issued after the February 12 and October 3, 1997 orders of the Ontario court (awarding her custody of the children). Those Ontario court orders were issued (without William Miller being present in person or through counsel at any hearing) in custody proceedings Doris Miller instituted there over a year after she filed the New York proceedings. Indeed, Doris Miller personally participated in the New York proceeding evidentiary hearings in September 1997 which ultimately led to the later New York court orders awarding custody to William Miller. And in September 1998 Doris Miller sought an order from the New York court granting her custody which relief was ultimately denied, and the award of custody to William Miller reaffirmed, in the New York court's unappealed order entered August 16, 1999. The New York court award of custody to William Miller has never been modified.

When William Miller forcibly removed the children from Doris Miller in Canada on August 28, 1998, the last decree outstanding was that of the New York court awarding him custody. The New York court undoubtedly had jurisdiction for that purpose and Doris Miller, the sole petitioner in this case, was bound by that decree notwithstanding the earlier February and October 1997 Ontario court orders. *See, e.g.*, Restatement (2nd) Conflict of Laws §§ 34, 70, 71, 79 & comments *a* ("a state has power to determine a child's custody or guardianship as between persons (normally the parents) who are competing for it and over whom it has personal jurisdiction") and *c* ("so long as it remains unmodified either at home or abroad, a custody decree rendered by a court having jurisdiction under the rules stated in this section will be recognized in other states"), and 114; Restatement (2nd) Judgments § 15.

I do not understand the June 1999 decision of the Ontario Court of Appeal to hold otherwise. Rather, as I read it, that decision held that the Ontario trial court erred in its September 1, 1998 decision, which set aside the October 3, 1997 Ontario court decision awarding Doris Miller custody, because the trial court "*should have refused to consider* the application of the husband *until* the children were returned

to the custody of their mother." (emphasis added). This followed the appellate court's reference to the trial court's having "deal[t] with the wife's disobedience with respect to the New York court orders regarding custody of the children," after which the appellate court went on to say:

> "Whatever rights the husband may have had by reason of the orders of Judge Crapsi [judge of the New York court] or otherwise, he had no right either to assault his wife or to abduct the children. In our view, his conduct should have been condemned by the application judge in the strongest possible terms. Whatever the faults of the wife, the husband had to be made aware that his objectives could not be achieved by *violence or other unlawful conduct. To consider his application* in the circumstances, was to approbate his conduct." (emphasis added)

The Court of Appeal made it clear that it was not ultimately ruling on who was legally entitled to custody, but rather was holding that that should not be decided until the status quo, as it existed before William Miller's resort to violent self-help, was restored. The Court of Appeal cast no doubt on the trial court's September 1, 1998 finding that Doris Miller "flagrantly has been holding the children in direct contravention of a [March 24, 1998] court order issued by a Niagra Falls, New York court," in the proceeding which Doris Miller instituted, awarding custody to William Miller. Thus, I am unable to agree with the statement in this Court's opinion that "[w]e reject Miller's contentions that Ms. Miller wrongfully retained the children in Canada upon issuance of the New York [March 1998] order."

   Nevertheless, I would not attempt to grant William Miller relief in the present appeal (assuming any is now practically available). He did resort to violent and unlawful self-help, the custody issue has been left open both in these Hague Convention proceedings and by the Ontario Court of Appeal, and, most importantly, the children have for well over a year now been returned to their mother in Canada. As directed by the district court, the children were put on an airplane for Canada on November 4, 1999. Apparently no stay was sought from

this Court. *Cf. Diorinou v. Mezitis*, No. 00-9501, 2001 WL 20835 at *3 (2d Cir. Jan. 9, 2001).*

---

*A week's stay was orally requested in the district court, but not to allow an application for stay to this Court but rather to get the children ready and to gather more evidence to present to the district court. Had a brief stay been requested to allow a stay application to this Court to be presented and acted on it seems a fair assumption that such relief would (and should) have been granted.