Victor ANTUNEZ–FERNANDES, Petitioner,

v.

Jill CONNORS–FERNANDES, Respondent.

No. 02–1028 LRR.

United States District Court, N.D. Iowa, Eastern Division. Eastern/Dubuque Division.

April 24, 2003.

Deborah J Hughes, Crawford Sullivan Read & Roemerman PC, Cedar Rapids, IA, for Plaintiff.

Brent C Oleson, Howes Law Firm PC, Cedar Rapids, IA, for Respondent.

## MEMORANDUM OPINION AND ORDER REGARDING PETITION FOR RETURN OF CHILDREN

READE, District Judge.

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................806

II.   FACTUAL BACKGROUND ..........................................806

III.  JURISDICTION ...............................................809

IV.  LEGAL ANALYSIS .............................................809
    A.  Prima Facie Case of Wrongful Detention ..................809
        1.  Habitual Residents ...............................810
        2.  Custody Rights and the Exercise Thereof...........811
    B.  Affirmative Defenses ....................................812
        1.  Whether Mr. Fernandes Acquiesced in the Wrongful Removal and
            Retention ........................................812

   2.  Whether the Proceeding Was Commenced After More Than One
       Year Had Elapsed and Whether the Children are "Well Settled" In
       Their New Environment ........................................ 814
   3.  Risk of Grave Harm .......................................... 815
   4.  Wishes of the Children ...................................... 816

V.  ATTORNEY'S FEES AND COSTS ..................................... 816

VI.  CONCLUSION ................................................... 817

This matter is before the Court pursuant to Victor Angunez–Fernandes' Petition for the Return of the Minor Children (docket no. 1). The Court held an evidentiary hearing on March 27, 2003. Both parties testified at the hearing. The Court accepted a declaration of Michel BES, Attorney at Law in St. Etienne—Montbrison, France, regarding French custody law along with a copy of relevant French statutes. Respondent also presented testimony from Father Phillip Kruse, Dr. Julie Hanson, M.D., Ms. Lynda Eigenberger, Ms. Jean Burgmeier, and Mrs. Joyce Connors. After considering the testimony and other evidence received at the hearing as well as the arguments of the parties, the Court finds as follows:

## I.  INTRODUCTION

Petitioner Victor Antunez–Fernandes ("Mr.Fernandes") filed this action on December 17, 2002 against Respondent Jill Connors–Fernandes ("Mrs.Fernandes") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, as implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq.* ("ICARA").

Mr. Fernandes argues under the Hague Convention that his wife wrongfully removed and retained their two minor children in the United States and that their children must therefore be returned to their "habitual residence" of France. In response, Mrs. Fernandes contends that: (1) there was no "wrongful" removal or retention of the children; (2) the children's

habitual residence is the United States; (3) Mr. Fernandes acquiesced to the children's removal or retention in the United States, or subsequent thereto, he acquiesced in such removal or retention; (4) it is appropriate to take account of the children's views; and (5) there is a grave risk that the children's return to France would expose them to physical or psychological harm or otherwise place the children in an intolerable situation.

## II.  FACTUAL BACKGROUND

Mr. and Mrs. Fernandes are husband and wife, having been married in Audrezieux–B, France on June 18, 1994. The parties are the parents of two minor children, Cecilia Joyce Fernandes, born April 15, 1996 and Vincent Thomas Fernandes, born April 30, 1998. Cecilia is now 7 years of age and Vincent is 4 years of age. Both of the children were born in Saint Prest eu Jarez, France.

Mr. and Mrs. Fernandes met while she was teaching English in France during the 1992—1993 school year. Mr. Fernandes was and continues to be employed as a supervisor for a cylinder and mechanics company in France. Both parties were and remain legal citizens of countries other than France and are allowed to work in France under a French work visa. The parties continued to date each other for the remainder of the 1992—1993 school year. Mrs. Fernandes left France at the end of the school year due to the expiration of her employment contract. Mr. Fernandes visited her in the United States that summer.

After marrying in June, 1994, Mr. and Mrs. Fernandes resided in Andrezieux–B, France. The Fernandes family lived continuously together in France from the time of their marriage in 1994 until November 8, 2000. The children attended school in France, having started pre-school there at age two. The parties stipulate that up and until November 11, 2000, the children's habitual residence as defined in 42 U.S.C. § 11603 was Andrezieux–B, France.

In August 2000, the family vacationed in Dubuque, Iowa, with Mrs. Fernandes' family. Within one month of their return to France, Mrs. Fernandes indicated that she wanted the family to either move to the United States or to purchase a home in France. Shortly thereafter, Mrs. Fernandes stated that she wanted a divorce. Mr. Fernandes did not want to divorce but rather wanted to work to preserve the marriage.

Mrs. Fernandes filed for divorce in France. It is unclear whether Mr. Fernandes received notice of the divorce filing. On November 7, 2000, Mrs. Fernandes obtained a note from her physician stating that she was suffering from depression and anxiety. On November 8, 2000, Mrs. Fernandes left the children at home with Mr. Fernandes and appeared *ex parte* before a Judge of the French court and requested permission to move from the marital home with the children based upon the note from her physician. She was granted permission to move to the home of a friend, Colette Peiller. On November 8, 2000, at approximately noon, Mrs. Fernandes returned home accompanied by local police, packed bags, and left with the children. Mr. Fernandes was not permitted by the officers to examine the court order. He learned of its contents when he went to the court himself later that day to get a copy. French police told Mr. Fernandes he could follow Mrs. Fernandes and the children as they left the home. After they left the home of Ms. Peiller, Mr. Fernandes did not know where his wife and children had gone.

Mrs. Fernandes and the children were at the home of Ms. Peiller for only a few hours. They did not spend the night but went on to a shelter. According her testimony, Mrs. Fernandes left France with the children on Saturday, November 11, 2000 to go to Dubuque, Iowa. Mrs. Fernandes is originally from Dubuque, Iowa and much of her family continues to reside in Dubuque, Iowa.

On Monday, November 13, 2000, Mrs. Fernandes sought and obtained an *ex parte* domestic abuse no contact order from the Iowa District Court in Dubuque County, Iowa. In her Petition for Relief from Domestic Abuse, she alleged that "[Mr. Fernandes] has threatened to take the kids away and I would never see them again. He has taken their passports." Mrs. Fernandes testified at the March 27, 2003 hearing before this Court that Mr. Fernandes had "pulled a knife" on her, but this allegation was not made in her Petition for Relief from Domestic Abuse. Mrs. Fernandes does not allege that Mr. Fernandes has psychologically or physically abused the children. Mr. Fernandes was not served with the protective order until June of 2001. There is no record of a hearing having have been held on the domestic abuse petition.

Mr. Fernandes made numerous calls to determine the children's whereabouts. Calls to Mrs. Fernandes' parents' home in Iowa went unanswered. Messages were not returned. Several weeks after leaving France, Mrs. Fernandes confirmed to a mutual friend from France that she and the children left France and were now in Iowa.

In a November 22, 2000 e-mail to Mr. Fernandes, which was also sent to him by regular mail, Mrs. Fernandes stated that she intended to return with the children

for the divorce hearing in France scheduled for January 19, 2001, and that it was not her intention to change the children's residence from France. Mrs. Fernandes did not return for the January 2001 divorce hearing and, as a result, her case was dismissed. Despite her failure to appear for the divorce hearing, Mr. Fernandes continued to believe that his wife and children would return to France and the marriage could be saved.

Mr. Fernandes came to the United States in February 2001, at the same time as Mrs. Fernandes' grandmother's funeral. Mr. Fernandes was permitted limited contact with the children. He came to the United States again in June of 2001. During this visit he was served with the no contact order. He was allowed to see the children during the day with one or more of Mrs. Fernandes' family members present at all times. Mr. Fernandes testified that it was at this time that he realized that his wife would not return to France with the children.

Mr. Fernandes then sought a mechanism to return his children to France. His French attorney was apparently unaware of the Hague Convention. Mr. Fernandes learned about the Hague Convention through a community agency. As soon as he learned about the Hague Convention, he contacted the French Ministry of Justice, the Central Agency in France (the "Ministry"), which accepts Hague Convention applications. The Ministry wanted certain documents translated. This took several months. The French Ministry sent Mr. Fernandes' Hague Convention application to the United States Central Agency, the National Center for Missing and Exploited Children (the "National Center"), on March 25, 2002. After some months of written communication with the National Center, the National Center undertook to find United States counsel for Mr. Fernandes. Mr. Fernandes was re-ferred to Iowa counsel in the fall of 2002. The Petition in this matter was filed December 19, 2002.

From the time Mrs. Fernandes left France with the children, Mr. Fernandes has been allowed periodic telephone calls with the children. During his visits to the United States in February 2001, June 2001, and December 2001, Mr. Fernandes was allowed limited, supervised time with the children. When Mr. Fernandes advised Mrs. Fernandes that he planned to come to the United States to see the children for Christmas 2002, she warned that if he came to the United States, he would be arrested. He came to the United States, telephoned about seeing the children on the morning of December 20, 2002, and was arrested on the afternoon of December 20, 2002. He spent Christmas week in jail in Dubuque, Iowa, during which he was served with a divorce action, which had just been filed in Dubuque County, Iowa. Through counsel, Mr. Fernandes was able to see the children briefly, again supervised, before returning to France.

Mrs. Fernandes has continued to reside in Dubuque, Iowa with the children since November 11, 2000. The children are currently enrolled in the St. Columbkille Catholic School in Dubuque, Iowa. Cecilia is enrolled in first grade. Vincent is enrolled in the pre-school program. By all accounts, the children are performing very well scholastically and have healthy relationships with fellow students. The children are active in curricular and extracurricular programs. The children and their mother attend Catholic Mass on a regular basis and the children are active in religious education both during the school week and during Mass on Sundays. The children regularly attend daycare with other children at the home of Lynda Eigenberger and have done so since the children and Mrs. Fernandes have resided in Du-

buque, Iowa. Ms. Eigenberger reported that the children are well-adjusted to their routine and environment and stated that no physical or emotional problems confront the children to her knowledge. Dr. Hansen, the family pediatrician, reported that the children have no substantive medical or emotional problems that she has observed in their regular physical check-ups or "wellness" visits. Additionally, no educational staff members or administrators have reported any physical, emotional, or behavioral problems with either of the children.

The children's French has deteriorated significantly since leaving France despite the fact that Mrs. Fernandes teaches French for a living and speaks French fluently. Mrs. Fernandes testified that she stopped speaking French to the children when the children, at ages 2 and 4, "screamed" that they not be spoken to "that way."

Mr. Fernandes remains a resident of Andrezieux–B, France. Mr. Fernandes retains citizenship status in the country of Portugal and has no citizenship status in his resident country of France. Mrs. Fernandes is a resident of Dubuque, Iowa in the United States. She retains citizenship status in the country of the United States and has no citizenship status in the country of France. Cecilia Fernandes currently resides in the United States. Cecilia has dual citizenship status in the countries of Portugal and the United States. Cecilia has no citizenship status in the country of France. Vincent Fernandes currently resides in the United States. Vincent has dual citizenship status in the countries of Portugal and the United States. Vincent has no citizenship status in the country of France.

### III. JURISDICTION

In 1980, various nations, including the United States, agreed to the Hague Convention; eight years later, Congress implemented the Treaty by passing ICARA. According to its findings, Congress enacted the Treaty to establish "legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights." 42 U.S.C. § 11601(a)(4). To achieve these ends, district courts of the United States have been granted original jurisdiction over actions arising under the Hague Convention. 42 U.S.C. § 11603. Mr. Fernandes' Petition for Return of Child, therefore, is properly before this Court.

### IV. LEGAL ANALYSIS

#### A. Prima Facie Case of Wrongful Detention

The Hague Convention, to which both the United States and France are signatories, was created to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble, 51 Fed.Reg. 10,498. The Hague Convention covers both wrongful removal and wrongful retention. *Id.* The Hague Convention is intended "to restore the *status quo ante* and to deter parents from crossing international boundaries in search of a more sympathetic court." *Silverman v. Silverman,* 267 F.3d 788, 791–92 (8th Cir.2001) (quoting *Rydder v. Rydder,* 49 F.3d 369, 372–73 (8th Cir.1995)). *See also Lops v. Lops,* 140 F.3d 927, 936 (11th Cir.1998); *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996) ("*Friedrich II* "). This is because the country where the child is a "habitual resident" is in a better position to determine questions of custody. *Croll v. Croll,* 229 F.3d 133, 137 (2nd Cir.2000).

The Court begins its analysis with the plain language of the Treaty and its implementing legislation. *See United States v. Alvarez–Machain,* 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning"). Both the Treaty and ICARA require the inquiry into a child abduction claim to be a narrow one. Indeed, Congress provides that courts are empowered "to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). Similarly, Article 19 of the Treaty cautions that, "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." In other words, under the Hague Convention, the district court is empowered to determine the merits of the abduction claim, but not the merits of the underlying custody claim. *Rydder,* 49 F.3d at 372 (citing *Friedrich v. Friedrich,* 983 F.2d 1396,1400 (6th Cir.1993) (*"Friedrich I "*)). *See also Miller v. Miller,* 240 F.3d 392, 398 (4th Cir.2001) (citing *Shalit v. Coppe,* 182 F.3d 1124, 1128 (9th Cir.1999)); *Lops,* 140 F.3d at 936; *Friedrich II,* 78 F.3d at 1063–64.

Mindful of these obligations, the Court must first determine whether Mr. Fernandes can establish, by a preponderance of the evidence, that the children were "wrongfully removed or retained within the meaning of the Convention." *See* 42 U.S.C. § 11603(e)(1)(A); *Miller,* 240 F.3d at 398. To establish a *prima facie* case of wrongful removal or retention under the Hague Convention, Mr. Fernandes bears the burden of proof to show that: (1) the children were "habitually resident" in France immediately before Mrs. Fer-

nandes removed them to the United States; (2) that the children's removal was in breach of the "rights of custody" of "a person, an institution or any other body;" and (3) that those rights "were actually exercised at the time of removal or would have been so exercised in the absence of his removal." *See* Hague Convention, Art. 3.

### 1.  Habitual Residents

There is no doubt that, at the time immediately preceding their removal to the United States, the children were "habitually resident" in France. While the Hague Convention does not itself define what it means to be "habitually resident," courts have concluded that the term refers to a child's customary residence prior to his removal. *See Miller,* 240 F.3d at 400 (citing *Friedrich I,* 983 F.2d at 1401 (citing *In re Bates,* No. CA 122.89, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989))); *Rydder,* 49 F.3d at 373. Although this inquiry necessarily proceeds on a case-by-case basis, *see id.* (citations omitted), it focuses not upon a child's domicile, or legal residence, but where the child physically lived for "an amount of time sufficient for acclimitization and which has a 'degree of settled purpose' from the child's perspective." *Silverman,* 312 F.3d at 916 (citing *Feder v. Evans–Feder,* 63 F.3d 217, 224 (3rd Cir. 1995)).

The children lived their entire life in France prior to the date of their removal. They were born in France and attended school in France. Because the evidence clearly demonstrates that the children continuously resided in France from the time of their births to the date of their removal, the Court holds that the children were "habitually resident" in France for the purposes of the Hague Convention.[1] Fur-

---

**1.** Mrs. Fernandes may not argue successfully that the children should be considered "habit-

ual residents" of the United States for the purposes of the Convention. In *Miller,* the

ther, it is undisputed by Mrs. Fernandes that the children were habitual residents of France at the time she left France with the children.

### 2. Custody Rights and the Exercise Thereof

Having established that France was the children's country of habitual residence immediately before the date of removal, the Court now examines whether Mrs. Fernandes' removal and retention of the children breached Mr. Fernandes' custody rights under French law.[2] In order for Mr. Fernandes to prevail, he must satisfy the two remaining elements of Article 3:(1) whether the children's removal was in breach of "rights of custody" of "a person, an institution or any other body," and (2) whether those rights "were actually exercised at the time of removal or would have been so exercised in the absence of his removal." *See* Hague Convention, Art. 3; *see also Miller*, 240 F.3d at 398.

■ To answer these questions, the Court must determine whether these rights existed in the country where the children were "habitually resident" prior to their removal. *See* Hague Convention, Art. 3. "Rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *See id.*, Art. 5. These rights may arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *See id.*, Art. 3. The Hague Convention, therefore, broadly defines "rights of custody;" its accompanying report states that " 'the law of the child's habitual residence is invoked in the widest possible sense,' and the sources from which custody rights derive are 'all those upon which a claim can be based within the context of the legal system concerned.' " *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir.2000). Indeed, the rights in the country in which the child is habitually resident may be broader than those in the country where the abduction case is adjudicated, and courts may take notice of these rights "without recourse to the specific procedures for the proof of that law...." *See id.*, Art. 14.

■ In this case, the Court must therefore determine whether, under French law, Mr. Fernandes had "rights of custody" relating to the children. The Court takes judicial notice that Articles 371 and 372 of the French Civil Code (the "FCC"), applicable at the time of the children's removal to the United States, mandate that a child under the age of eighteen is subject to joint parental authority. Article 371(3) of the FCC prohibits the child leaving the family home or being taken away from it without the permission of a parent.

Fourth Circuit Court of Appeals noted that a parent can not create a new habitual residence by wrongfully removing and sequestering a child. *Miller*, 240 F.3d at 400 (citing *Diorinou v. Mezitis*, 237 F.3d 133, 141–42 (2nd Cir.2001)). Indeed, the Hague Convention refers to the question of habitual residence in the context prior to "removal or retention," and "any breach of custody or access rights." Hague Convention, Art. 3 & 4. The Hague Convention mentions it in no other context. Therefore, even if this Court, *arguendo*, were to find that Mrs. Fernandes did not *wrongfully* remove the children, the Convention allows this Court to consider a

"removal"—not only a "wrongful removal"— when determining what constitutes a habitual residence.

2. "The Hague Convention establishes that the law of the country in which a child was habitually resident governs decisions as to whether custody rights existed at the time of removal, and it permits judicial notice to be taken of that country's law." *Bocquet v. Ouzid*, 225 F.Supp.2d 1337, 1345 (S.D.Fla. 2002) (citing Hague Convention, Art. 14, 51 Fed. Reg. at 10,508 and *Shealy v. Shealy*, 295 F.3d 1117, 1123 (10th Cir.2002)).

See id. If the parents cannot agree on what the child's interests require, the decision should be made based on the past practice of the parents, or a family judge can decide if a compromise cannot be reached. See id. at 2, 3. French law grants no privilege of custody to either of the parents in particular. As a result, French law grants "rights of custody" cognizable under the Hague Convention. The Court therefore holds that Mr. Fernandes had such "rights of custody."

■ The Court further finds that Mr. Fernandes was exercising his custody rights at the time of the children's removal. Although Mrs. Fernandes obtained an "Ordinance" from the French court on November 8, 2000 granting her permission to move from the marital home with the children to the home of a nearby friend, it did not give her custody of the children or permission to leave France with the children. This "Ordinance" did not impair Mr. Fernandes' right to custody or right to exercise that custody.

The Court concludes that Mr. Fernandes has satisfied his burden of proving by a preponderance of the evidence that his children were wrongfully removed to and retained in the United States by Mrs. Fernandes.

### B. Affirmative Defenses

■ Under the Hague Convention, the Court's inquiry does not end upon finding wrongful retention or removal. Once Mr. Fernandes establishes that wrongful retention has occurred, the children must be returned to France unless Mrs. Fernandes establishes by clear and convincing evidence that any of the Hague Convention's affirmative defenses apply. Nunez–Escudero v. Tice–Menley, 58 F.3d 374, 376 (8th Cir.1995) (citing 42 U.S.C. § 11603(e)(2)). The Hague Convention provides affirmatives defenses that may be advanced by a respondent who opposes the return of a child. These affirmative de-

fenses are as follows: (1) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (2) the proceeding was commenced more than one year after the removal of the child; (3) the children have become settled in their new environment; and (4) there is a grave risk that the return of the children would expose them to physical or psychological harm. See Hague Convention Art. 13. "[A] court applying the Hague Convention should construe these exceptions narrowly." Rydder, 49 F.3d at 372, citing Friedrich I, 983 F.2d at 1403. "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." Miller, 240 F.3d at 402; England v. England, 234 F.3d 268, 270–71 (5th Cir.2000); Friedrich II, 78 F.3d at 1067 (citing Feder, 63 F.3d at 226) (citing Pub. Notice 957, 51 Fed.Reg. 10494, 10509 (1986)).

Having found that Mr. Fernandes has met his burden of establishing, by a preponderance of the evidence, a prima facie case of wrongful removal and detention, the Court next turns to whether any of the exceptions set forth in the Hague Convention applies.

### 1. Whether Mr. Fernandes Acquiesced in the Wrongful Removal and Retention

■ Mrs. Fernandes argues that Mr. Fernandes consented to or subsequently acquiesced in the wrongful retention of their children. Mrs. Fernandes asserts that she should therefore be afforded the protection of the first of the foregoing affirmative defenses under Article 13. In order for her to prevail, Mrs. Fernandes must show by a preponderance of the evidence that Mr. Fernandes consented to or subsequently acquiesced to the children remaining in the United

States. *See Friedrich II*, 78 F.3d at 1067 (citing Hague Convention Art. 13(a)). In *Friedrich II*, the Sixth Circuit Court of Appeals held that "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II*, 78 F.3d at 1070. "Subsequent acquiescence requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Id.* (citing *Wanninger v. Wanninger*, 850 F.Supp. 78, 81–82 (D.Mass.1994)).

The *Friedrich II* court rejected the respondent's argument that the petitioner acquiesced. *See Friedrich II*, 78 F.3d at 1069–70. Arriving at its conclusion, the *Friedrich II* court weighed contradictory testimonial evidence by the parties as to whether the petitioner told his wife that he consented to the removal of their children. *See id.* at 1069. In the absence of other evidence, the *Friedrich II* court relied on the respondent's unannounced, "deliberatively secretive" departure from the habitual residence and ignored statements the petitioner allegedly made to third parties. *Id.* (finding that the "deliberatively secretive nature of her actions is extremely strong evidence that [the petitioner] would not have consented to the removal of" their child).

Courts in the United States, England, and France have found acquiescence to be a subjective test. The English House of Lords held, "Acquiescence is a question of the actual subjective intention of the wronged parent, not of the outside world's perception of his intentions." Re H and Others, (1997) 2 W.L.R. 563, 573B (citing *Friedrich II*, 78 F.3d at 1060; *Wanninger*, 850 F.Supp. at 78 and *Horlander v. Hor-*

*lander*, 1992 Bull. Civ. I, No. 91–18.177). In *Horlander*, the high court in France found that acquiescence is subjective and refused to find acquiescence where the petitioner's intention to acquiesce was not "unequivocal." In *Wanninger*, a Massachusetts district court significantly discounted circumstantial evidence of acquiescence once the court established that the petitioner's intentions were not to acquiesce, but to reconcile his marriage. *See Wanninger*, 850 F.Supp. at 82 (de-emphasizing letters the petitioner wrote to a third party and relying on the petitioner's statements and letters of reconciliation made to his wife). This Court likewise finds acquiescence to be a question of subjective intent. Here, Mr. Fernandes reasonably believed, up until June of 2001, that return and reunification with his wife and children was possible. Only then did he learn of the no contact order. Prior to that time he had written and oral statements from his wife that she did not intend to remove the children permanently from France. Mrs. Fernandes failed to go forward with the French divorce and did not file for divorce in the United States until after Mr. Fernandes filed the Petition in this case.

■ From June of 2001 forward, Mr. Fernandes made an effort to have his children returned. He contacted the French Ministry of Justice about making a Hague Convention application and followed their instructions until the case was referred to the United States Central Agency, the National Center for Missing and Exploited Children. He followed their instructions until he was able to obtain counsel. Further, efforts toward reconciliation or visitation with the children do not constitute consent to the children's removal. *Bocquet v. Ouzid*, 225 F.Supp.2d 1337, 1350–51 (S.D. Fla. 2002); *Koc v. Koc*, 181 F.Supp.2d 136, 150–51 (E.D.N.Y. 2001).

*See also* Linda Silberman, *Hague Convention on International Children Abduction: A Brief Overview and Case Law Analysis,* 28 Fam. L.Q. 9, 26 (1994) (noting that "as a general rule courts should be careful not to translate negotiation into acquiescence. To do so could lead lawyers to refuse to talk or negotiate at all for fear of creating the impression of acquiescence, and could encourage litigation at the expense of a more amiable resolution"). The Court thus finds that Mr. Fernandes did not subjectively intend to acquiesce to the children's removal to and retention in the United States.

**2. Whether the Proceeding Was Commenced After More Than One Year Had Elapsed and Whether the Children are "Well Settled" In Their New Environment**

■ Article 12 of the Hague Convention mandates the return of children "where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contract state where the child is, a period of less than one year has elapsed." However, "even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, [the court] shall also order return of the child, unless it is demonstrated that the child is now settled it its new environment." Hague Convention, Article 12.

Even under the most generous reading of when the removal ultimately became wrongful, such as the date Mrs. Fernandes failed to appear for the French divorce hearing on January 19, 2001, or even when Mr. Fernandes was served with the no contact order in June of 2001, the Petition in his case was filed more than one year after such removal. Commencement of proceedings, as used in Article 12, means

the filing of a civil petition for relief in any court which has jurisdiction in the place where the child is located at the time the petition is filed. 42 U.S.C. §§ 11603(f)(3), 11603(b). This makes the "well settled" exception applicable to Mrs. Fernandes' actions in this case.

The children are currently enrolled in the St. Columbkille Catholic School in Dubuque. Cecilia is enrolled in first grade. Vincent is enrolled in the pre-school program. By all accounts, the children are performing very well scholastically and have healthy relationships with fellow students. The children are active in curricular and extra-curricular programs. The children and their mother attend Catholic Mass on a regular basis. The children are active in religious education both during the school week and during Mass on Sundays. Mrs. Fernandes presented testimony from the priest at the parish where she and the children attend church, the principal of the parochial school where the children now attend school, the children's physician whose children also attend the same school, and the children's day care provider. All testified the children were "well settled" in Dubuque, Iowa. The children regularly attend daycare with other children at the home of Lynda Eigenberger and have done so since the children and Mrs. Fernandes have resided in Dubuque, Iowa. Ms. Eigenberger reported that the children are well-adjusted to their routine and environment and stated that no physical or emotional problems confront the children to her knowledge. Dr. Hansen, the family pediatrician, reported that the children have no substantive medical or emotional problems that she has observed in their regular physical check-ups or "wellness" visits. Additionally, no educational staff members or administrators have reported any physical, emotional, or behavioral problems with either of the children. This evidence is determinative on

the question of whether the children are "well settled," but does not answer the question of whether the children should be returned to France.

Establishment of the "well settled" exception does not make refusal of a return order mandatory. The Court retains the discretion to order the children returned even if an exception applies. 51 Fed.Reg. 10,509. Direction for such a determination must come from the fundamental principles the Hague Convention was created to preserve. As set forth above, the Hague Convention was created to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble, 51 Fed.Reg. 10,498. The Court is mindful that the Hague Convention is intended to restore the pre-abduction status quo and deter parents from crossing international borders in search of a more sympathetic court. *Nunez–Escudero*, 58 F.3d at 376; *Lops*, 140 F.3d at 936; *Friedrich II*, 78 F.3d at 1064. This is because the country where the child is a "habitual resident" is in a better position to determine questions of custody. *Croll v. Croll*, 229 F.3d 133, 137 (2nd Cir.2000).

Although more than one year has elapsed since their abduction, Mrs. Fernandes should not ultimately benefit from the effects of her own actions and the barriers Mr. Fernandes faced in bringing his petition. Mrs. Fernandes' actions are exactly what the Hague Convention seeks to remedy. By bringing the children into the United States and into a community where her extended family is already well established, she knowingly and successfully created language, cultural, distance and financial barriers to Mr. Fernandes' efforts to seek return of his children to France. Within 48 hours of her arrival in the United States, Mrs. Fernandes took advantage of *ex parte* procedures in the Iowa District Court to create additional legal barriers between Mr. Fernandes and his children. She did to Mr. Fernandes exactly what she feared he might do to her; that is to take the children to another country and do everything possible to cut off a continuing meaningful relationship between parent and child. Had Mr. Fernandes not come to the United States to have what limited contact Mrs. Fernandes would allow, he would not have seen his children at all after November 8, 2000. Mrs. Fernandes' intent is clear from her refusal to maintain the children's fluency in French despite her own fluency in French and despite the fact that Mr. Fernandes speaks little English. For these reasons, this Court will exercise its discretion to return the children to France.

### 3. *Risk of Grave Harm*

Article 13(b) of the Hague Convention allows a court to deny return of a child to the country of habitual residence if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." A grave risk of harm for the purposes of the Hague Convention can exist in only two situations: (1) when there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute, e.g., returning the child to a zone of war, famine, or disease; or (2) when there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection. *Silverman*, 312 F.3d at 919 (citing *Friedrich II*, 78 F.3d at 1069 and *Blondin v. Dubois*, 238 F.3d 153, 166 (2nd Cir.2001)).

The Court notes that under the Hague Convention, the grave harm exception to the return of wrongfully removed children does not give the court in the abducted-to country a license to speculate on where the children would be happiest; that decision is a custody matter and is reserved to the court in the country of habitual residence. *Friedrich II*, 78 F.3d at 1068. "Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return. The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a 'grave' risk of harm for the purposes of the Convention." *Id.* (emphasis supplied).

In this case, Mrs. Fernandez does not claim that returning the children to France would present a grave risk of physical or psychological harm or place the children in an intolerable situation. Mrs. Fernandez alleges nothing more than adjustment problems that would result from the relocation of the children. Mrs. Fernandez has presented no evidence that Mr. Fernandez has psychologically or physically abused the children, or that there is a risk of future abuse. There is nothing in the record that would indicate that life in France would result in any permanent harm or unhappiness for the children.

Mrs. Fernandes advocates a wide interpretation of the grave risk of harm exception that would reward her for violating the Hague Convention. A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted. For these reasons, the Court finds that the record does not demonstrate by clear and convincing evidence that the children would be exposed to a grave risk of harm if they were returned to France.

### 4. Wishes of the Children

A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13, unnumbered paragraph. This provides a separate and independent basis for a court to refuse to return a child to the country of habitual residency, *Blondin*, 238 F.3d at 166, although like other exceptions it is narrowly applied. *England*, 234 F.3d at 272.

At ages seven and four, Cecilia and Vincent have not attained an age or degree of maturity to make it appropriate to take their views into account. Because the Court finds that return of the children to France would further the aims of the Hague Convention, the Court therefore will exercise its discretion to so order despite the children's views.

## V. ATTORNEY'S FEES AND COSTS

The ICARA provides for the payment of fees and costs. "Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3).

Mr. Fernandes incurred travel expenses of $600 for a plane ticket, $350 for car rental, and $40 per day for a hotel ($40 × 7 = $240). He has incurred translation costs of $717.75, including a transla-

tor for trial. Mr. Fernandes' attorney, Ms. Hughes, accepted this case on a *pro bono* basis with the understanding that attorney's fees were available under the ICARA should Mr. Fernandes prevail. Her firm has provided $7,531.50 in legal services. Mr. Fernandes paid this court's filing fee of $150.00 and service costs of $62.51. Mr. Fernandes is entitled to an award of these fees and costs.

## VI. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Petitioner Victor Antunez–Fernandes' Petition for the Return of Child (docket no. 1) is **GRANTED.**

2. Petitioner and Respondent's two minor children shall be **RETURNED** to France, at Respondent's expense, on or before May 25, 2003 with Respondent should she wish to accompany them.

3. Should Respondent prove unwilling to accompany the children back to France in keeping with this Order, the children shall be returned to France with Petitioner.

4. Respondent shall not remove the two minor children from the Northern District of Iowa pending their return to France.

5. Respondent shall pay Mr. Fernandes' attorney's fees and costs in the amount of $9,651.76, along with any additional court costs due.