C.J. Williams, Chief United States Magistrate Judge
TABLE OF CONTENTS
I. Introduction...878
II. Procedural History...878
III. Factual History...878
IV. Jurisdiction...881
V. Applicable Law...882
VI. Discussion...882
A. Wrongful Removal or Retention...883
1. Habitually Resident...883
2. Custody Rights and the Exercise Thereof...884 *878 a. Turkish Civil Code...884
b. Exercise of Custodial Rights...887
B. Affirmative Defenses...890
1. Acquiescence...891
2. Grave Risk...892
VII. S.M.L. and I.Y.L....895
A. International Authority...896
B. Spirit of the Convention...898
VIII. Conclusion...901
I. INTRODUCTION
This matter is before the Court following an evidentiary hearing pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention") as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 et seq. , on Petitioner Ozgur Can Leonard's ("petitioner") Second Amended Verified Complaint Under The Hague Convention ("Complaint") (Doc. 57). The parties consented to proceed before the undersigned United States Magistrate Judge for all matters pertaining to this case, including final disposition, and the Honorable Linda R. Reade, United States District Court Judge, reassigned the instant case to the undersigned. (Doc. 84). After considering the testimony and other evidence received at the hearing, as well as the arguments of the parties, the Court concludes that respondent Rachel Joy Lentz ("respondent") is entitled to judgment in her favor.
II. PROCEDURAL HISTORY
Petitioner initiated this action on May 8, 2017, (Docs. 1-2), and filed the Complaint against respondent on September 14, 2017. (Doc. 57). In the Complaint, petitioner seeks the return of his three children to the Republic of Turkey, pursuant to the Hague Convention. (Doc. 57, at 15-17). On August 22, 2017,[1] respondent filed an Answer (Doc. 42), denying having taken any wrongful action. Respondent further asserted that petitioner acquiesced to the removal of the children from Turkey and the return of the children to Turkey would create a grave risk that the children would suffer some physical or psychological harm or otherwise place the children in an intolerable situation.
The parties briefed the issues, and the Court held an evidentiary hearing and heard argument on October 18, 2017. The parties submitted supplemental briefs on October 25, 2017 (Docs. 86 and 87), which the Court has duly considered. The matter is now fully submitted and ready for decision.
III. FACTUAL HISTORY
Both petitioner and respondent were born in Istanbul, Turkey. (Doc. 57, at 3). Petitioner is a dual citizen of Turkey and the United States. (Id. ). Respondent is a United States citizen but was raised in, and spent most of her life in, Istanbul, Turkey. (Id. ). On May 29, 2014, petitioner and respondent were married in Turkey. (Id. ; Ex. 2, Doc. 85-3). Petitioner and respondent established their marital home in Gokceada, a Turkish island comprising part of the Canakkale Province. (Id. at 5). During all periods of marital cohabitation, the couple lived in Gokceada. In March of 2015, while residing in Gokceada with petitioner, respondent gave birth to petitioner's son, I.Y.L. (Id. ).
In August of 2015, respondent took I.Y.L. from Gokceada to Istanbul to reside with her parents, but petitioner did not leave Gokceada at this time. (Id. ). In or *879 around September of 2015, petitioner learned respondent was pregnant with petitioner's twin daughters. (Doc. 75, at 3). Throughout respondent's pregnancy with the twin girls, she and petitioner were in contact regarding the pregnancy. (Doc. 57, at 5-6). On February 17, 2016, petitioner traveled from Gokceada to Istanbul to accompany respondent to her final medical appointments and to stay with her during and after the birth of the twins. (Id. at 6). Soon thereafter, respondent gave birth to E.M.L. and S.M.L. (Id. ). Following respondent's discharge from the hospital after giving birth, respondent chose to reside with her parents, rather than return to Gokceada. (Id. ).
Immediately following their birth, E.M.L. and S.M.L. were admitted to the Newborn Intensive Care Unit ("NICU"). (Id. ). E.M.L. was diagnosed with End-Stage Renal Disease ("ESRD") and required surgery. (Id. ). Petitioner paid for respondent to stay in a private room in the hospital for the twins' birth and also signed the consent forms for the twins' admission to the NICU and for E.M.L.'s surgery. (Id. ). Petitioner registered the twins' births and added them to his Turkish National Health Insurance. (Id. ). It is undisputed that petitioner and respondent are the parents of I.Y.L., E.M.L. and S.M.L. (Id. at 3). The children are all dual citizens of Turkey and the United States. (Id. ).
Petitioner remained in Istanbul for more than a month while E.M.L and S.M.L. were in the NICU, before eventually returning to his home in Gokceada. (Id. at 6-7). During this time, petitioner and respondent shared in the responsibility of meeting with physicians to discuss their daughters' conditions and to provide care for the twins. (Id. ). After their discharge from the NICU, E.M.L. began receiving treatment for her ESRD at the Istanbul University Cerrahpasa Faculty of Medicine ("Cerrahpasa"), which respondent believed could provide the best care in Turkey for E.M.L.'s condition. (Id. at 7-8).
During the time of the twins' hospitalization in the NICU, I.Y.L. celebrated his first birthday. The parties disagree as to the reason for petitioner's absence from the celebration-petitioner claims he was not invited to participate in his son's birthday, while respondent claims petitioner expressed no interest in celebrating birthdays and did not inquire as to I.Y.L.'s birthday. In any case, it is undisputed that petitioner was not present for the birthday celebration. (Id. at 7; see also Doc. 42, at 6).
Following the twins' hospitalization, respondent made plans to baptize I.Y.L. in Istanbul. (Doc. 57, at 8). Petitioner was apparently not involved in the planning of the baptism (id. ), although he did voice objections to the children being baptized by Father Agathangelos (Ex. R, Doc. 85-219, at 1 ("i [sic] want to make it clear that i [sic] don't want [Father] [A]gathangelos to baptize [the children]")). Petitioner traveled back to Istanbul from June 9, 2016, through June 11, 2016, and visited with his children for eight to nine hours each day. (Doc. 57, at 8-9). These visits took place at respondent's parents' residence in Istanbul. (Id. ). Petitioner returned to Gokceada on June 12, 2016. (Id. ).
In sum, petitioner visited with each of his children daily for approximately one month following the twins' birth, and further spent eight to nine hours with the children each day for three days prior to the children's removal to the United States. Aside from the month following the twins' birth and the three-day visit, petitioner did not maintain a physical presence in his children's lives. Although petitioner was aware E.M.L. would require home dialysis treatment and that E.M.L.'s caretakers would need to undergo training to provide such treatment, petitioner declined *880 to take part in any training sessions, even when invited to do so. Despite having had multiple opportunities to become fluent in E.M.L.'s home care needs, petitioner has still not been trained in providing home dialysis for E.M.L.
On June 14, 2016, respondent filed for divorce in the Istanbul 15th Family Court ("Turkish Family Court"), Case No. 2016/446. (Id. at 9). Respondent requested temporary custody of the children so she could travel with them out of the country; however, this request was denied. (Id. ). In July of 2016, respondent sought an ex parte protective order against petitioner from the Turkish Family Court, alleging that petitioner was not caring for the children, was harassing her with phone calls and messages, and was pressuring her to return to Gokceada from Istanbul. (Id. ). On July 11, 2016, the Turkish court issued a protective order, providing, inter alia , that petitioner not approach respondent's place of residence and cease communications with respondent. (Id. at 10; see also Ex. 6, Doc. 85-7). The protective order did not place any limits on petitioner's contact with the children. (Doc. 57, at 10). Petitioner appealed the Turkish protective order, but the appeal was rejected. (Id. ).
Over the course of the following months, petitioner attempted to meet with the children on multiple occasions. (See id. at 11). Contrary to petitioner's allegations, respondent invited petitioner to spend time with the children, however, respondent was not comfortable with petitioner having unsupervised access to the children. (See, e.g. , Ex. Y, Doc. 85-226). Specifically, respondent told petitioner multiple times that he may spend time with I.Y.L., but because petitioner had been absent from I.Y.L.'s life for an extended period and I.Y.L. was very young, petitioner was essentially a stranger to I.Y.L. (Id. ("I'm open into easing into things with [I.Y.L.]. He has changed in these last months and does not go to anyone easily. I think it would be best if you came over to see all of [the children] first, and then maybe we can go out to the park with [I.Y.L.] just the two of us, before he's alone with you.")).
Respondent applied for United States passports for her children and on July 15, 2016, United States passports were issued to all three children. (Doc. 57, at 10). On August 11, 2016, petitioner filed an Answer to the divorce petition in the Turkish Family Court, requesting the Turkish Family Court deny respondent temporary custody because petitioner viewed the custody request as a ruse to permanently remove the children from the jurisdiction. (Id. at 11). Petitioner sought a temporary injunction to prevent the children from being removed from Turkey and further petitioned the court for temporary custody of I.Y.L. and visitation rights for the children until a custodial order could issue. (Id. at 11-12). On August 12, 2016, the Turkish Family Court issued a temporary injunction, ordering the children to remain in the jurisdiction during the pendency of the divorce proceedings and further issued an order to all borders to prevent the children's removal from the jurisdiction without petitioner's consent. (Id. at 12; see also Docs. 85-10, 85-11). Turkey's Directorate of Security acknowledged on August 23, 2016, the prohibition on the children leaving the country was implemented. (Ex. 69, Doc. 85-70).[2] Respondent contends that when she removed the children from Turkey on August 13, 2016, she was unaware of the ne exeat order, and no evidence has been presented to the contrary.
*881 On or about August 13, 2016, respondent traveled to the United States with the children, removing them from the jurisdiction. (See Doc. 57, at 12). On August 16, 2016, petitioner traveled to Istanbul to attempt to see the children. (Id. ). On August 17, 2016, petitioner was able to contact respondent's father, Steven Lentz, and learned that respondent and the children were in the United States. (Id. at 12-13). Petitioner had some awareness of respondent's plans to remove the children to the United States, though whether petitioner consented to their removal is disputed. On August 24, 2016, petitioner submitted a request to return the children to the United States Department of State pursuant to the Hague Convention. (See id. at 13).
Upon coming to the United States, respondent brought the children to Iowa and has been residing in Eagle Grove, Iowa since. (See id. at 14). E.M.L. was thereafter admitted to the University of Iowa Health Care system ("UIHC") in Iowa City, Iowa where she remained from August 15, 2016, through August 18, 2016. (Id. at 13). On August 21, 2016, respondent emailed petitioner and indicated that "E.M.L.... is just as active and really on par as far as development [when compared to S.M.L.]." (Id. ). Following this brief communication, respondent deleted her email account. (Id. at 14). UIHC records from August 25, 2016, corroborate respondent's statement to petitioner. (See id. at 13 ("UIHC records from August 25, 2016 state '[E.M.L.] is on track developmentally.' ")). In October of 2016, E.M.L. was again hospitalized at UIHC and had a feeding tube inserted; E.M.L. had also contracted peritonitis.[3] (Id. at 15).
Petitioner has requested the Turkish Family Court to review the medical records in this case to determine the severity of E.M.L.'s medical condition. (Id. at 13-14). Since early 2017, petitioner has been in contact with one or more of E.M.L.'s physicians at UIHC regarding E.M.L.'s health. (Id. at 15). Petitioner engaged in a dialogue with the American medical team to become more well-versed in E.M.L.'s condition and to ensure E.M.L. was receiving proper treatment. (See Doc. 85-185, at 3, Statement of Dr. Jennifer Jetton ("[Petitioner] has been in communication with [Dr. Jetton]. He has demonstrated interest in [E.M.L.'s] health, asked questions, summarized his own research regarding [E.M.L.'s] dialysis and the care of patients with end-stage renal disease.")). The parties disputed, however, whether petitioner's communication was beneficial to E.M.L.; respondent argued that petitioner was attempting to persuade the medical team to forego appropriate treatment and testing because he distrusted them or thought he knew better from his own research, while petitioner insisted he had a valid basis for questioning E.M.L.'s treatment and in one instance a doctor agreed with him that decreasing a particular treatment method was appropriate.
To the best of the Court's knowledge, the divorce proceedings in the Turkish Family Court are ongoing and no formal divorce decree or custodial order has been entered. However, the Court is unable to determine-and the parties do not agree-exactly how the custody issue will proceed from this point.
IV. JURISDICTION
In 1980, various nations, including the United States, agreed to the Hague Convention; eight years later, Congress implemented the Convention by passing ICARA. According to its findings, Congress *882 enacted the Convention to establish "legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights." 22 U.S.C. § 9001(a)(4). To achieve these ends, United States district courts have been granted original jurisdiction over actions arising under the Hague Convention. § 9003.
V. APPLICABLE LAW
The Hague Convention, to which both the United States and Turkey are signatories, was created, in part, "to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody." Hague Convention, 51 Fed. Reg. 10,494, 10,504 (Mar. 26, 1986). The Hague Convention covers both wrongful removal and wrongful retention of children. ( Id. ). The Hague Convention is intended " 'to restore the status quo ante and to deter parents from crossing international boundaries in search of a more sympathetic court." Silverman v. Silverman , 267 F.3d 788, 791-92 (8th Cir. 2001) (quoting Rydder v. Rydder , 49 F.3d 369, 372 (8th Cir. 1995) ); see also Lops v. Lops , 140 F.3d 927, 936 (11th Cir. 1998) ; Friedrich v. Friedrich ("Friedrich II "), 78 F.3d 1060, 1064 (6th Cir. 1996). This is consistent with the notion that the country where the child is a "habitual resident" is in a better position to determine questions of custody. Croll v. Croll , 229 F.3d 133, 137 (2d Cir. 2000), abrogated on other grounds by Abbott v. Abbott , 560 U.S. 1, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010).
The Court first looks to the plain language of the Hague Convention and ICARA. See United States v. Alvarez-Machain , 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."). Both the Convention and ICARA require the inquiry into a wrongful removal or retention claim to be a narrow one. Indeed, Congress provides that courts are empowered "to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). Similarly, Article 19 of the Convention cautions that, "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." In other words, under the Hague Convention, the Court is empowered to determine the merits of the wrongful removal and/or retention claim, but no more. See Rydder , 49 F.3d at 372 (citing Friedrich v. Friedrich ("Friedrich I "), 983 F.2d 1396, 1400 (6th Cir. 1993) ); see also Miller v. Miller , 240 F.3d 392, 398 (4th Cir. 2001) (citing Shalit v. Coppe , 182 F.3d 1124, 1128 (9th Cir. 1999) ); Lops , 140 F.3d at 936 ; Friedrich II , 78 F.3d at 1063-64. Thus, the Court will not consider any issues relating to the custody dispute itself.
VI. DISCUSSION
The Court must first determine whether petitioner can establish that the children were wrongfully removed or retained from Turkey. If the Court finds petitioner established a prima facie case under the Convention, the Court must then determine whether any affirmative defenses apply that would permit respondent to retain the children in the United States. Respondent asserts two affirmative defenses under Article 13 of the Convention: 1) petitioner consented to or acquiesced in the removal or retention, and 2) there is a grave risk that returning the children "would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation."[4] Hague Convention art. 13; Doc. 42, at 2.
*883 An affirmative defense claimed under Article 13b of the Convention must be proven by clear and convincing evidence, while an affirmative defense claimed under any other provision of Article 13 must be proven by only a preponderance of the evidence. 22 U.S.C. § 9003(e)(2). Thus, as the first affirmative defense relating to consent or acquiescence falls under Article 13a, respondent bears the burden of establishing this affirmative defense by a preponderance of the evidence. The second affirmative defense, relating to grave risk, is set forth by Article 13b; therefore, respondent bears the heightened burden of establishing this affirmative defense by clear and convincing evidence.
A. Wrongful Removal or Retention
In order to establish a prima facie case of wrongful removal or retention, petitioner bears the burden of establishing, by a preponderance of the evidence, that: 1) the children's place of habitual residence was Turkey immediately before respondent removed them from the jurisdiction; 2) the children's removal breached petitioner's "rights of custody" over the children; and 3) such rights of custody "were actually exercised [at the time of removal] or would have been so exercised but for the removal or retention." See Hague Convention art. 3; 22 U.S.C. § 9003(e)(1)(A) ; Friedrich II , 78 F.3d at 1064 ("The petitioner in an action for the return of the child has the burden of proving the exercise of custody rights by a preponderance of the evidence."); Ermini v. Vittori , No. 12 Civ. 6100(LTS), 2013 WL 1703590, at *10 (S.D.N.Y. Apr. 19, 2013) ("To establish a prima facie case, Petitioner must establish by a preponderance of the evidence that: (1) the children were habitually resident in Italy, but were removed to or retained in the United States; and (2) the removal or retention was in breach of Petitioner's custody rights under the law of Italy, and Petitioner was exercising those rights at the time of the children's removal to or retention in the United States." (citation and internal quotation marks omitted)).
1. Habitually Resident
Although the Hague Convention does not itself define what it means to be "habitually resident" in a jurisdiction, courts have concluded the term simply refers to the child's customary residence prior to his or her removal. See Miller , 240 F.3d at 400 (citing Friedrich I , 983 F.2d at 1401 ); Rydder , 49 F.3d at 373. This inquiry necessarily proceeds on a case-by-case basis, focusing not upon a child's domicile or legal residence, but where the child physically lived for "an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Feder v. Evans-Feder , 63 F.3d 217, 224 (3d Cir. 1995). Further, "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." Miller , 240 F.3d at 400.
Here, the Court finds there is no serious dispute as to I.Y.L., S.M.L. and E.M.L.'s place of habitual residence prior to their removal. All three children were born in Turkey, resided in Turkey until their removal from the jurisdiction, and were registered under petitioner's Turkish national health insurance. Although the children were dual citizens of the United States and Turkey, it would appear from the record that at least the two youngest children, and possibly I.Y.L., never left Turkey until they were brought to the *884 United States by respondent. Furthermore, respondent does not appear to contest that the children's place of habitual residence is Turkey. Accordingly, the Court finds that prior to being brought to America, the children's place of habitual residence was Turkey.
2. Custody Rights and the Exercise Thereof
The Court now turns to the related questions of whether the children's removal and retention from Turkey breached petitioner's custody rights under Turkish law and whether, absent the children's removal or retention, petitioner would have exercised those rights. There is little question as to whether petitioner had custodial rights at the time of the children's removal. Further, the Court finds petitioner still retains those custodial rights, as the Turkish court has yet to address the issue of custody.
The Convention provides:
The removal or retention of a child is to be considered wrongful where-a) it is in breach of rights of custody attributed to a person ... either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention ; and b) at the time of removal or retention, those rights were actually exercised ... or would have been so exercised but for the removal or retention.
Hague Convention art. 3 (emphasis added). Thus, Turkish law governs whether petitioner had custodial rights at the time of the children's removal, whether the children's removal breached those rights, and whether petitioner was either actually exercising those rights at the time of the children's removal, or would have exercised those rights absent their removal. Larbie v. Larbie , 690 F.3d 295, 307 (5th Cir. 2012) ("If [the petitioner shows that the respondent removed or retained the child somewhere other than the child's habitual residence], the question becomes whether the removal or retention violated the petitioner's 'rights of custody' under the habitual residence nation's laws.").
a. Turkish Civil Code
Under Turkish law, parents of a child share custody of the child "together as long as marriage lasts." (Ex. 4, Doc. 85-5, at 1). Further, respondent's Turkish divorce lawyer appeared via videoconference and testified[5] that until the Turkish court awards custody to one parent individually, both parents have custody over the children. Here, the Court is considering the narrow question of whether petitioner had custodial rights over the children at the time they were removed from Turkey, or whether he had such rights during the children's retention outside of Turkey. Thus, it is of no consequence that both parties agree there is a high likelihood respondent will ultimately be awarded custody of the three children under Turkish law. It is sufficient to merely determine that petitioner did have custodial rights at *885 the time of the children's removal and continues to have those custodial rights during their retention in the United States.
However, although petitioner did have custodial rights at the time the children were removed from Turkey, petitioner was not exercising those rights at the time of the removal, nor has petitioner established he would have exercised those rights had the children not been removed. Because the wrongful removal or retention of the children must be established before the Court reaches the question of whether any affirmative defense applies, petitioner carries the burden of showing he was exercising his custodial rights at the time of the children's removal, or he would have exercised those rights had the children not been removed. Petitioner carries the burden of establishing, by a preponderance of the evidence, that the children were wrongfully removed or retained. 22 U.S.C. § 9003(e)(1)(A). Petitioner has not met this burden and, thus, has failed to make a prima facie showing of wrongful removal or retention. Therefore, petitioner's motion to have the children returned to Turkey must fail.
The custodial rights bestowed upon petitioner are governed by Turkish law, as set forth in the Convention. Petitioner only alleges he was exercising two such custodial rights at the time of the children's removal from Turkey:[6] 1) the right to dictate, together with the child's mother, whether the child may leave the home; and 2) the right to decide the child's religious education. (Doc. 57, at 41; Turkish Civil Code, Ex. 4 Doc. 85-5, at 1 (providing "[t]he child cannot leave the house without taking his/her parents' consent ...." and "[p]arents shall have the right to decide on the child's religious education.")). The other custodial rights petitioner alleges in his complaint are not rights under Turkish law, but rather are obligations a parent must meet. The Convention addresses only whether custodial rights were exercised at the time of removal or would have been exercised in the absence of removal; the Convention does not contemplate the exercise of obligations , nor does it appear the Convention was intended to contemplate the exercise of obligations. See Elisa Pérez-Vera, Explanatory Report on the Hague Convention of 1980 on the International Abduction of Children (hereinafter Pérez-Vera Report").[7] Although the Convention provides little explanation with respect to the phrase "rights of custody," the Convention favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." Pérez-Vera Report, at ¶ 67; Abbott , 560 U.S. at 19-20, 130 S.Ct. 1983. However, even though the Court must take a broad reading of custodial rights, the overarching premise is "the law of the child's habitual residence is invoked in the widest possible sense." Pérez-Vera Report, at ¶ 67. Thus, if a court is presented with a situation wherein reading the phrase "rights of custody" with great *886 flexibility would be in conflict with "the law of the child's habitual residence," the flexible reading of "rights of custody" must yield so as to allow the overarching premise to guide the court's reading. (Id. ).
Petitioner appears to allege that he was further deprived of four additional custodial rights: 1) the right to make decisions for the care and education of the child; 2) the right to name the child; 3) the right to "protect the child's physical, mental, spiritual, moral, and social development;" and 4) the right to be the legal representative of one's children. (Doc. 57, at 4, ¶¶ 13-1(i), 13-1(vi), 13-1(vii), 13-1(ix)). These assertions, however, mischaracterize Turkish law. With respect to these four alleged "rights," the Turkish Civil Code provides: 1) "Parents shall make and apply the necessary decisions about the child's care and education" (Ex. 4, Doc. 85-5, at 1 (emphasis added)); 2) "Parents shall name the child;" (id. (emphasis added)); 3) "Parents shall educate the child ... and provide and protect him/her [sic] physical, mental, psychological, ethical and social development (id. (emphasis added)); and 4) "Parents are the legal representatives of the child" (id. , at 2 (emphasis added)). Further, Turkish law characterizes these alleged "rights" as "liabilities," and they continue to apply, even after a parent is legally deprived of custody and, as a result, loses all custodial rights. (See Turkish Civil Code, Ex. 4, Doc. 85-5, at 3 ("Where custody is abolished, liabilities of the parents to meet the children's care and education expenses shall continue.")). The continuation of these liabilities beyond the time during which a parent maintains any custodial rights is strong evidence these are custodial obligations rather than custodial rights. As previously stated, the Convention contemplates only custodial rights, not custodial obligations. Thus, the Court need not consider whether these obligations suffered interference by the children's removal or retention from Turkey.
Petitioner does, however, assert he did exercise two of his custodial rights. (Doc. 57, at ¶¶ 13-1(v), 13-1(viii)). Specifically, petitioner alleges that he did exercise his right to withhold consent for the removal of the children from the home, and his right to determine the children's religious education. (See id. ; Turkish Civil Code, Ex. 4, Doc. 85-5, at 1). The language defining these rights contrasts sharply with the language defining parental obligations , outlined above. The Turkish Civil Code provides "[t ]he child cannot leave the house without taking his/her parents' consent," and "[p]arents shall have the right to decide on the child's religious education." (Id. , at 1 (emphasis added)). In providing that a child cannot leave the home without his or her parents' consent, the Turkish Civil Code frames the provision around conditions the child must meet prior to leaving the home, mainly that the child must obtain consent from both parents prior to leaving the home. The corollary of this provision is that a parent has the right to refuse to consent to a child leaving (or being taken from) the home and, thereby may prevent the child from leaving the home. As such, this provision can properly be termed a right.
Likewise, the Turkish Civil Code clearly states "[p]arents shall have the right to decide on the child's religious education." (Id. ). This enunciation of the right to decide religious education requires no elucidation. It is clear a parent has this custodial right. Finally, the Turkish Civil Code does not reserve these rights to a parent in the event a parent loses custody of a child. (See Ex. 4, Doc. 85-5). Because these rights are abolished when a parent loses custody and a parent only maintains certain parental obligations following the abolishment of custody, it follows that these two enumerated custodial rights are indeed rights, as opposed to obligations. Had the Turkish Civil Code intended these *887 rights to be interpreted as obligations, they likely would have persisted even following the abolishment of custody. As they do not persist, the determination that these are, in fact, rights, is a sound one.
Although the Turkish Civil Code may provide for other custodial rights, the Court need not consider these because petitioner only alleges that two of his custodial rights were violated. (See Doc. 57, at 4). As such, the Court's inquiry shall end upon a consideration of the two aforementioned custodial rights. Further, Article 3 of the Convention "requires that the [petitioner] provide only some preliminary evidence that he actually took physical care of the child, a fact which normally will be relatively easy to demonstrate." Pérez-Vera Report, at ¶ 73. Absent evidence petitioner took physical care of the children, petitioner will not have met his burden under Article 3. (Id. ).
b. Exercise of Custodial Rights
The Court must now turn to whether petitioner was exercising his custodial rights to withhold consent to the children's removal from the home, and/or his right to determine the children's religious education at the time of the children's removal from Turkey, or that petitioner would have exercised these rights absent the removal. Bearing in mind petitioner's obligation to establish the violation of his custodial rights as part of petitioner's prima facie case, the Court finds petitioner was not exercising these rights and would not have exercised these rights had the children not been removed from Turkey.
Petitioner must show he either exercised his right to withhold consent for his children's removal from his home in Gokceada,[8] or that he would have withheld such consent had the children not been removed from Turkey. See 22 U.S.C. § 9003(e)(1) (requiring a petitioner to establish his prima facie case by a preponderance of the evidence). Instead, the evidence shows petitioner was ambivalent on the matter of whether the children were physically present in petitioner's house. (See, e.g. , Ex. 13, Doc. 85-14, at 4: "I thought it better to not come to Istanbul than to allow the children to be struggled over."). At best, petitioner's attitude toward the physical whereabouts of the children could be characterized as inconsistent.
Respondent's father testified that on one occasion, respondent had resolved to leave petitioner, taking I.Y.L. with her; the pair was to travel to Istanbul and stay with respondent's parents at their home in Istanbul. However, on this specific occasion, as detailed by respondent's father, petitioner presented respondent with the ultimatum of either leaving I.Y.L. in petitioner's care-meaning respondent would travel to Istanbul without her infant son-or not leaving at all. Although the accuracy of this testimony is in debate, if true, this testimony would show that on one occasion only, petitioner refused to consent to I.Y.L.'s departure from his house. Further this latter incident preceded the former, in which petitioner had acquiesced to the children's residence in Istanbul and further stated it was best he not be there. (Ex. 13, Doc. 85-14, at 4 (the latter incident was prior to the birth of the twins while the former incident was after)). In short, it appears to the Court that petitioner *888 largely acquiesced in the removal of the children from the house and to allowing respondent to live with them in Istanbul.
Such equivocation is insufficient to show, by a preponderance of the evidence, that petitioner withheld his consent for the children to leave his house, or that he would have withheld such consent. Rather, the Court, which is in the best situation to determine issues of fact, is left perplexed as to whether petitioner consented for the children to leave his house or not. Where a court is simply unable to determine a question of fact, it is inappropriate for the court to find the fact has been proven by a preponderance of the evidence. Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for South. Cal. , 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("The burden of showing something by a 'preponderance of the evidence,' ... 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.' " (brackets in original) (internal quotation marks omitted) (quoting In re Winship , 397 U.S. 358, 371-72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring))). As such, the Court finds petitioner has not met his burden of showing he was exercising this custodial right at the time the children were removed from Turkey. ( Id. ).
Further, where the Court cannot conclusively determine whether petitioner exercised this right prior to the children's removal, there is no plausible way for the Court to determine that petitioner would have exercised this right prospectively. Petitioner presented no evidence reflecting a future intent to exercise the custodial right of controlling whether the children left his house. As a result, the Court must conclude petitioner did not meet his burden of showing, by a preponderance of the evidence, that he was exercising his custodial right to withhold consent for the children's removal from his house at the time the children were taken from Turkey, or that he would have exercised this right had the children not been taken from Turkey.
Likewise, petitioner failed to establish he was exercising his right to decide his children's religious education at the time of their removal, or that he would have exercised this right absent their removal. Although petitioner discussed having his children baptized and made known he did not want Father Agathangelos to baptize his children (Ex. R, Doc. 85-219, at 1), at no point does petitioner assert that he took affirmative action to decide the religious education of the children. Wishing one's children to be baptized, and even having the children baptized, could be indicative of bestowing some religious belief on the children, but this alone does not decidedly show petitioner undertook any affirmative effort to ensure the children would be educated on religion. Baptizing one's children at a very young age is not necessarily indicative that one or both of the parents agreed to raise the children in that religion.
The record is devoid of any evidence showing petitioner even discussed whether the children would be raised in a religious manner. It could very well be that the parties understood the children would be raised in the same religion as their parents and therefore did not need to discuss the issue. It is just as possible, however, the parties intended the children to decide their own religious beliefs and practices as they matured and became more familiar with various religious doctrines. In fact, respondent herself converted to Orthodoxy after considering the conversion for a lengthy period of time. It is petitioner's burden to show he exercised his right to *889 decide the religious education of the children, or that he would have exercised his right to decide the religious education of the children. Absent even a scintilla of evidence showing petitioner's ideas regarding the children's religion-or absence thereof-were even communicated by petitioner at any time, the Court cannot find petitioner has shown, by a preponderance of the evidence, that petitioner exercised this right or would have exercised this right.
It is worth noting that petitioner provided financial support to his estranged wife and children and continued offering financial support, even though such offers were rejected. In spite of these rejections, petitioner testified he has set aside money each month in the approximate amount petitioner believes he would be required to pay in support of his children. However, this Court is bound by Turkish law with respect to whether petitioner was exercising his custodial rights. Larbie , 690 F.3d at 307. Under Turkish law, when one parent is deprived of custody of his children, that parent continues to bear the obligation to provide financial support for the children's care and educational expenses. (Ex. 4, Doc. 85-5, at 3). It follows that providing financial support for one's children is an obligation under Turkish law, rather than a custodial right. Thus, petitioner's willingness and seeming ability to provide financial support for his children cannot provide support for his exercise of custodial rights.
As noted, the Court's first task was determining whether petitioner established a prima facie case by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1). To meet his burden, petitioner must show his custody rights, as established by Turkish law, were violated by the children's removal from Turkey, and that at the time the children were removed from Turkey, petitioner was either exercising those rights, or that had the children not been removed, petitioner would have exercised those rights. The preponderance of the evidence standard requires, naturally, evidence. If a petitioner fails to present any evidence, it is impossible, by definition, for him to meet his burden by a preponderance of the evidence. Yet, that is precisely what petitioner has asked this Court to do. Petitioner has presented no evidence to show the exercise or impending exercise of his custodial rights was halted or prevented by the children's removal from Turkey. Therefore, this Court is unable to find petitioner has made a prima facie case under the Hague Convention.
As a final matter, the evidence and testimony presented show petitioner did not maintain a physical presence in his children's lives and did not provide them with physical care. Aside from the first month after the twins' births, petitioner saw his children for, collectively, approximately twenty-four hours in the entire time the children lived in Istanbul. Further, petitioner, an American citizen, has not traveled to America to visit the children, although he has expressed an ability to do so.[9] Petitioner's presence in his children's lives has been almost entirely a virtual one, over the Internet and Skype. Petitioner's physical presence has been almost nonexistent. As such, petitioner cannot be said to have met Article 3's threshold requirements. Pérez-Vera Report, at ¶ 73.
*890 Because petitioner has not made a prima facie showing, there is no basis upon which this Court should order the return of the children to Turkey, and the Court will not do so in this instance. The children-I.Y.L., S.M.L., and E.M.L.-are hereby not ordered returned to Turkey under the Hague Convention.
B. Affirmative Defenses
Given the complicated nature of this case, the Court finds it appropriate to further analyze whether legal grounds exist to order the children's return to Turkey, in the event a reviewing Court finds this Court's conclusion that petitioner did not establish a prima facie case erroneous.[10]
Where a petitioner has established a prima facie case under the Hague Convention, the Court's inquiry does not end upon a finding of wrongful retention or removal. Once petitioner establishes the wrongful retention has occurred, the children must be returned to Turkey unless respondent can establish one of the Convention's affirmative defenses applies. Should the Court determine an affirmative defense does apply, the Court will then determine whether to return the children to Turkey; however, the Court is not required to return the children. Hague Convention art. 13 ("[T]he judicial or administrative authority of the requested State is not bound to order the return of the child if [one of the affirmative defenses under Article 13 applies]." (emphasis added)).
Article 13 of the Convention provides two relevant affirmative defenses: 1) the person seeking return of the child consented to or subsequently acquiesced to the removal or retention; or 2) returning the child to his or her place of habitual residence would pose a grave risk he or she would suffer physical or psychological harm, or otherwise place the child in an intolerable situation. See Hague Convention art. 13.[11] "[A] court applying the Hague Convention should construe these exceptions narrowly." Rydder , 49 F.3d at 372 (citing Friedrich I , 983 F.2d at 1403 ). "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." Friedrich II , 78 F.3d at 1067 (citing Feder , 63 F.3d at 226 ). See also Miller , 240 F.3d at 402 ; England v. England , 234 F.3d 268, 270-71 (5th Cir. 2000).
ICARA sets the burden for proving one of these affirmative defenses. A party opposing the return of the child to his or her place of habitual residence due to the other parent's acquiescence or consent must prove such acquiescence or consent by a preponderance of the evidence. See 22 U.S.C. § 9003(e)(2)(B). On the other hand, a party asserting the so-called "grave risk" defense to the return of the child must prove the defense by clear and convincing evidence. See id. § 9003(e)(2)(A).
Here, respondent argues that petitioner acquiesced to the retention of the children *891 in the United States by petitioner's actions after the children's removal from Turkey. (See Doc. 75 at 6-8). Respondent further argues that returning E.M.L. to Turkey would pose a grave risk to E.M.L.'s health and well-being because of E.M.L.'s ESRD, which requires a kidney transplant and follow-up care performed at UIHC. (Id. at 9-13).
In response, petitioner argues he did not acquiesce to the children's removal and retention in the United States, as evidenced by his attempts to prevent their removal from Turkey and his attempts to ensure their return. (See Doc. 78 at 17-19). Petitioner also argues there is no grave risk of harm posed to E.M.L. upon her return to Turkey because the Turkish hospitals are capable of handling her medical issues. (Id. at 19-22). The Court is aware that due to current diplomatic events, respondent may face difficulty obtaining a visa to enter Turkey. Although the inability to obtain a visa is not an affirmative defense within the meaning of the Convention, the inability to obtain a visa is a relevant consideration to the grave risk affirmative defense and will be discussed in conjunction therewith.
1. Acquiescence
Respondent does not argue that petitioner consented to the children's removal, nor does the Court find that a colorable argument in favor of consent may be found in this case. In addition, the Court is not persuaded that petitioner acquiesced in the children's removal from Turkey. "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." Baxter v. Baxter , 423 F.3d 363, 371 (3d Cir. 2005) (citing Gonzalez-Caballero v. Mena , 251 F.3d 789, 794 (9th Cir. 2001) ). "[T]he defense of acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.' " ( Id. (quoting Friedrich II , 78 F.3d at 1070 )). Whether a party has acquiesced turns on the subjective intent of the party who allegedly acquiesced. ( Id. ). Therefore, the Court must consider whether petitioner's subjective intent was to acquiesce in the children's retention in the United States, as evidenced in a sufficiently formal manner.
Petitioner appeared before this Court to argue for his children's return to Turkey. Likewise, petitioner petitioned the Turkish Family Court to prevent his children's removal from Turkey and has not subsequently manifested any intent to revoke that petition by contrary pleadings or otherwise. At no point in either litigation can the Court find any evidence petitioner assented to the children's removal either before they were removed or after. Similarly, petitioner did not renounce his custodial rights in writing. To the contrary, those out-of-court written communications the Court is privy to-primarily emails between petitioner and respondent or respondent's father-show that petitioner was displeased with the children's removal to the United States and intended to pursue all legal avenues to ensure his children's return to Turkey. At no point did petitioner convey in writing any intent to renounce his rights.
The final consideration for the Court under the acquiescence defense is whether petitioner manifested acquiescence via his attitude over a significant period of time. Baxter , 423 F.3d at 371. Because the Court finds petitioner did not manifest acquiescence at any point, the Court need not consider what would constitute a significant period of time. Although respondent bears the burden of establishing *892 petitioner's subjective intent was to acquiesce in the relocation of the children, respondent offers little evidence or argument in support of acquiescence. Primarily, respondent contends that petitioner's communications with respondent and respondent's father amounted to acquiescence because petitioner understood the move to America was intended to be permanent and petitioner sought updates on his children's lives and well-being without simultaneously demanding their return to Turkey. The Court is not persuaded that petitioner's request for information about his children constituted acquiescence.
Respondent seems to suggest that because petitioner was aware the marriage was beyond repair and that petitioner did not demand the children's return to Turkey in light of this knowledge, petitioner thereby acquiesced in the children's removal. (Doc. 75, at 7). The Court does not agree. Petitioner does not contest respondent's assertion that petitioner had accepted his marriage with respondent was irreconcilable. (Id. ("[Petitioner] was aware that the parties would not reconcile.")). Indeed, petitioner actively participated in divorce proceedings in the Turkish court and had communicated to respondent his understanding that the marriage would not persist. In an email dated March 29, 2016, petitioner informed respondent that he would "file for a divorce after lent" because he "believe[d] it [was] the right thing to do." (Ex. O, Doc. 85-216, at 2). This is consistent with a belief that the marriage was beyond repair. However, an irreconcilable marriage coupled with requests for updates on the couple's children does not equate acquiescence to the children's removal to another country, as respondent would have this Court hold.
It appears petitioner had given up his attempts at reconciliation prior to respondent removing the children from Turkey. Therefore, petitioner's communications with respondent cannot properly be viewed as reconciliation attempts. However, they can properly be viewed as a father's requests for updates from the mother of his children. Immediately upon learning respondent did not have permission from the Turkish court to remove the children, petitioner emailed respondent's father and unequivocally stated that respondent and respondent's father "ought to return the children to Turkey until the court can decide issues of custody." (Ex. 77, Doc. 85-78). Respondent did not comply. Certainly, this demand is inconsistent with acquiescence.
Given the tumultuous history between petitioner and respondent and respondent's seemingly unwavering intent to bring the children to America, petitioner likely believed any further requests to return the children to Turkey would be futile. This Court declines to hold that a petitioner bringing a Hague petition must renew his or her non-acquiescence with every communication in order to preserve the right to seek the return of his or her children. When considering the totality of the circumstances, the evidence shows petitioner did not subjectively intend to acquiesce in the children's removal to the United States. Thus, respondent's first affirmative defense must fail.
2. Grave risk
The final affirmative defense the Court must consider is whether returning the children to Turkey would pose a grave risk to the children physically or psychologically, "or otherwise place the child[ren] in an intolerable situation." Hague Convention art. 13. Although the Court is tasked with determining whether any or all three of the children are to be returned to Turkey, the parties' arguments and evidence primarily focus on the grave risk posed to E.M.L. as a result of her medical condition, should E.M.L. be returned to *893 Turkey. Thus, the Court's discussion here will pertain to E.M.L. only; whether S.M.L. and I.Y.L. are to be returned to Turkey shall be discussed infra. However, with respect to E.M.L., based on the evidence presented, the Court concludes E.M.L. would face a grave risk if returned to Turkey at this time because of her unique medical needs.
In sum, respondent argues that Turkish hospitals are unable to fulfill E.M.L's medical needs and that, if E.M.L. were to be returned to Turkey at this time, she would likely face difficulty in receiving a kidney transplant, if a donor kidney were even available in Turkey, and would likely die as a result of the inadequate medical care available to her in Turkey. Respondent presented medical evidence showing the necessity of E.M.L. receiving a kidney transplant as soon as possible, including statements and testimony from Diana Zepeda-Orozco, M.D., E.M.L.'s American transplant nephrologist (Ex. EE, Doc. 85-182); statements and testimony from Jennifer G. Jetton, M.D., E.M.L.'s primary American pediatric nephrologist (Docs. 85-185, 85-204); and a statement from Professor Dr. Lale Sever, head of the Pediatric Nephrology Department at Cerrahpasa (Ex. EG-EH, Doc. 85-184).
Based on the evidence and, particularly, the testimony from Drs. Zepeda-Orozco and Jetton, the Court is persuaded that E.M.L. would face a grave risk of death or serious bodily harm if she does not receive a kidney transplant as recommended by her medical team. Under UIHC standards, the transplant may only be done if E.M.L.'s caretakers can commit to remaining in near enough proximity to UIHC that UIHC may continue to render follow-up care for at least one year post-surgery. UIHC has indicated an unwillingness to perform the surgery if E.M.L. will not follow-up with UIHC for at least one year.
As E.M.L. now weighs enough to be a viable candidate for a kidney transplant, E.M.L.'s medical team urges that E.M.L. needs a transplant as soon as possible to prevent further cardiovascular damage, infection, or other undesirable complications of ESRD. Any of these complications would pose a grave risk to E.M.L.'s physical well-being. Therefore, the Court finds that if E.M.L. does not receive a donor kidney, she will face a grave risk. The next inquiry, then, is whether E.M.L. may return to Turkey without incurring the grave risk associated with not having the transplant surgery.
The Court finds that ordering E.M.L. returned to Turkey at this time would pose a grave risk to E.M.L.'s physical health. The UIHC medical team is fully capable of providing E.M.L. with adequate medical care. The Court has been presented with abundant evidence documenting E.M.L.'s successes so far in being treated by UIHC and, further, of UIHC's ability to conduct the pediatric transplant. However, the Court has been presented with no evidence showing any Turkish facility is prepared to treat E.M.L. or that a viable donor kidney would be available to E.M.L. in Turkey. Petitioner argues the transplant can take place in Turkey with respondent as a potential donor and that minimal testing will need to be done, as the bulk of the necessary testing has already been completed. Thus, petitioner argues, these tests will not need to be conducted again. However, petitioner has presented no medical evidence to support the idea that the transplant can take place without both the donor and recipient again undergoing extensive testing that has already been conducted. Absent evidence to support petitioner's claims, the Court remains unpersuaded.
*894 The Court may only issue findings on the evidence presented. The Court has been presented with no evidence at all regarding Turkish medical facilities and their ability to care for E.M.L. Therefore, while it is entirely possible that E.M.L. could receive exceptional care in Turkey, the Court is simply precluded from finding E.M.L. could receive any care in Turkey because the Court has not been presented with any evidence on the matter. Therefore, the Court has no choice but to find that if E.M.L. were returned to Turkey, she may not receive the care she needs. Thus, this absence of certainty poses a grave risk E.M.L. may suffer physical harm if returned to Turkey at this time.
The Court's conclusion that returning E.M.L. to Turkey would pose a grave risk to her life and health is buttressed by petitioner's lack of training in caring for E.M.L.'s medical condition. Respondent received detailed training by medical personnel both in Turkey and the United States regarding her daughter's medical care. Respondent testified at length about the time consuming, daily care ritual that is required to care for and treat E.M.L. These procedures provide sophisticated medical equipment and hygienic surroundings. As noted, petitioner declined to undergo any training in how to care for E.M.L. Nor has petitioner presented any evidence he can provide appropriate daily care for E.M.L., or that necessary medical equipment and hygienic surroundings would be available for her in Turkey. Again, perhaps they would be, but the Court has no evidence before it from which to reach that conclusion.
Finally, the Court turns to the issue of the availability of a donor kidney in Turkey. Respondent, E.M.L.'s mother, is willing to donate one of her kidneys to E.M.L., has undergone the necessary testing, and is a match. Pending the results of a few confirmatory tests, respondent is expected to be approved as a donor for E.M.L. To date, petitioner has not been tested to determine whether he would be a match to donate one of his kidneys to E.M.L.; further, there seem to be limited inquiries into whether petitioner would be a suitable donor based on certain social criteria that are considered when assessing a potential donor (that is a social support system to assist the donor and patient during recovery and ongoing treatment in the following year). In any case, petitioner has yet to begin the lengthy process of being assessed as a donor, and no other donor has been located who could potentially donate a kidney, aside from respondent.
It is also important to note that respondent is not a Turkish citizen. Although petitioner and the three children hold dual citizenship in both Turkey and the United States, respondent does not. On October 8, 2017, both Turkey and the United States suspended visa services to the other country's citizens. Statement from the Turkish Mission to the United States (Oct. 8, 2017), http://vasington.be.mfa.gov.tr/Mission/ShowAnnouncement/336037; Ambassador John Bass' Statement on the Suspension of Visa Services in Turkey (Oct. 9, 2017), https://tr.usembassy.gov/ambassador-john-bass-statement-suspension-visa-services-turkey/. It is unclear when Turkey and the United States will resume issuing visas. Because respondent is an American citizen only, she is precluded from obtaining a visa to enter Turkey when traveling directly from the United States, which eliminates at present the possibility of respondent serving as a donor in Turkey until and unless visa services are restored.
Although American citizens have reportedly been issued visas to enter Turkey when traveling to Turkey from a country other than the United States, and this option could be available to respondent *895 (Docs. 86-1, 88[12] ), whether to issue visas is a decision to be made solely by Turkish authorities. (See Email from United States Department of State, Doc. 86-1, at 3 ("[T]he Government of Turkey makes all decisions regarding entry into, or transit of, the country, and may change those policies at any time.")). As such, Turkey may impose a total ban on the issuance of visas to American citizens. This determination would fall within the purview of Turkey as a sovereign nation, and it is inappropriate for the Court to speculate as to Turkey's policies in the future. Because Turkey may rightfully amend its policies at any time, and this Court is not privileged to know about future Turkish determinations, the Court is unwilling to find respondent could absolutely enter Turkey in the future in order to serve as a kidney donor for E.M.L.
Ordering the children returned to Turkey on the assumption that Turkey would issue respondent a visa to enter the country would be improper and, if respondent were not able to enter the country, E.M.L.'s health would be at grave risk. Therefore, the Court finds that pending the resolution of the diplomatic issue, respondent may be unable to enter Turkey and therefore may not be relied upon as a donor for E.M.L. Because there is no certainty respondent could serve as a donor, E.M.L. could be without a donor and the daunting task of finding another suitable donor would have to begin again from scratch. E.M.L.'s doctor testified that E.M.L. is in urgent need of a transplant. The Court is unwilling to leave such matters to chance and therefore finds that such a solution would pose a grave risk to E.M.L.'s physical health.
Even if Turkey restores visa services in the near future, returning E.M.L. to Turkey would still pose a grave risk to her physical well-being for the aforementioned reasons, namely that she requires a kidney transplant soon and that transplant can be readily done at UIHC while it could not be readily done in Turkey. Therefore, the Court denies petitioner's petition to have E.M.L. returned to Turkey under the Hague Convention because the Court finds a grave risk to E.M.L.'s health would exist if E.M.L. were returned to Turkey at this time.
VII. S.M.L. and I.Y.L.
The Court has already determined petitioner neither consented to the children's removal to Turkey nor subsequently acquiesced. Thus, assuming, in arguendo , petitioner did establish a prima facie case under the Hague Convention, the Court is faced with the question of whether to return S.M.L. and I.Y.L. to Turkey while E.M.L. remains in the United States. Notably, it is unlikely respondent will be able to return to Turkey until she is able to obtain a visa and recovers from donating her kidney to E.M.L. Thus, petitioner would be the only individual vested with guardianship rights that could care for S.M.L. and I.Y.L. in Turkey. The de facto *896 resolution, then, would be petitioner receiving sole custody of the children because respondent would be unable to be physically present in the same country as her children.
A. International Authority
" 'The interpretation of a treaty, like the interpretation of a statute, begins with its text.' " Abbott , 560 U.S. at 10, 130 S.Ct. 1983 (quoting Medellín v. Texas , 552 U.S. 491, 506, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) ). "This uniform, text-based approach ensures international consistency in interpreting the Convention." ( Id. at 12, 130 S.Ct. 1983 ). The Court must give considerable weight to "the opinions of our sister signatories," and this "principle applies with special force here, for Congress has directed that 'uniform international interpretation of the Convention' is part of the Convention's framework." ( Id. at 16, 130 S.Ct. 1983 (internal citations and quotation marks omitted); 42 U.S.C. § 9001(b)(3)(B) ). However, where the language of a treaty has been read erroneously, it is the duty of the Judiciary to correct such erroneous interpretations to prevent the perpetuation of such errors. See Medellín , 552 U.S. at 515, 128 S.Ct. 1346 (describing a situation in which the Supreme Court initially found a treaty was not self-executing, but upon receiving additional information in a later case, the Supreme Court found the same treaty to be self-executing; it was by virtue of the additional information the Court reached a contrary conclusion upon reconsidering the same treaty and thus reversed its own previous finding). Having concluded that E.M.L. would face a grave risk in being returned to Turkey, the Court now turns to whether this affirmative defense may be applied to all three children as a single unit, or if the Court must find a separate basis for refusing to order the return of each of the three children, should the Court refuse to separate the children. Otherwise stated, the Court must determine whether the children must each be considered separately under the Convention, or whether the Court may consider the children together as a single unit.
There is no controlling authority on this question. The Court finds several cases to be helpful in interpreting the Convention's language with respect to this issue. The first, Chalkley v. Chalkley , simply states "Article 13 of the Hague Convention speaks of the 'child' who is the subject of an application for return. It does not speak of 'children' or 'siblings.' The provisions of the [Convention] are to be applied separately and distinctly to each child who is wrongfully removed." [1994] 10 W.W.R. 114 (Can. Man. C.A.). The Chalkley court provides no reasoning for its finding that the Convention was intended to apply separately and distinctly to each child who may be involved. To the best of this Court's reading, the Chalkley court appears to have concluded the drafters considered a situation wherein multiple related children were the subject of Hague proceedings and the drafters further intended the Convention to be applied to each subject child individually. Absent evidence to support such an assertion, however, the Court finds it just as likely, based on its own reading of the Convention and the case law supporting such a finding, that the drafters never considered a situation may arise wherein the grave risk defense applies to only one child of several related children whose return is being sought under a single Hague petition.
Indeed, the plain language of the Convention indicates the drafters only explicitly contemplated a situation in which only one child was wrongfully removed from his or her habitual residence. There is no indication the drafters considered multiple children may be at issue in a single case. In each of the nine instances in the Convention *897 in which "children" are referenced, the term "children" is used in the abstract and not in relation to any specific children or any children in a single case. This indicates the drafters were concerned with children as a whole and not specifically the children who may be the subject of a Hague Convention case. In contrast, however, of the fifty-eight times the Convention references a singular "child," either the article "the" or the article "a" precedes "child" fifty-seven times.[13] When read in context, then, the term "child" indicates the specific child at issue in any given case. At no time does the Convention reference "the children." Had the drafters contemplated a situation in which multiple children may be at issue in any given case, it would be illogical to provide terms for the return of only one child. Thus, the notion the drafters only considered that one child could be at issue in any given case is legally sound when the terms "child" and "children" are read in context.
More narrowly, the Court finds the Convention provides no indication regarding what should be done when a party removes more than one child, and a court finds it would pose a grave risk to return one child, but not another. The Convention and its history reflect the grave risk contemplated was that posed by an abusive parent, which presumably would apply to all children.
In the instant case, of course, three children are at issue and the grave risk exception applies to only E.M.L. Again, there is no controlling authority directing this Court's decision on what to do with the other two children. When other courts have been faced with the situation of an affirmative defense applying to only one of multiple children, those courts have determined the children must be kept together. See, e.g. , J.M.H. v. A.S. , [2010] NBQB 275 (Can. N.B. Q.B.); Re S, N, C [2005] NIFam 1 (N. Ir.). In J.M.H. v. A.S. , the court reasoned that where one child would face an intolerable situation should he be returned to his country of habitual residence, the younger sibling would likewise face the same "cruel" situation in being separated from her brother. As such, the court found "[t]he children simply can't be split up." [2010] NBQB at ¶ 55. Likewise, the Northern Ireland Family Court found that, although the Hague Convention did not apply to the case presented, had the Hague Convention applied, the court would have declined to separate the three siblings because "it would be in the best interests of all the children that they should be together as a family." Re S, N, C , at ¶ 24.
As in J.M.H. and S, N, C , this Court is faced with the difficult situation of whether to return I.Y.L. and S.M.L. to Turkey and thereby deprive all three siblings of the companionship they have grown accustomed to. The children have been together since E.M.L. and S.M.L. arrived home following their birth. These children share a strong bond and, further, the bond between E.M.L. and S.M.L. is not merely the bond of siblings who have always lived together, but rather the special type of bond that can be shared only between twins. To leave E.M.L. without the companionship and support of her siblings, or to deprive I.Y.L. and S.M.L. of their sister would be, as it would have been in J.M.H. , cruel. The Court is unwilling to subject the children to such cruel treatment.
The Chalkley court concluded, however, the children in that case should be split up. This Court finds Chalkley distinguishable.
*898 The Chalkley court was presented with half-siblings who were twelve years apart in age. The older child, who was not the biological child of the petitioner, was adopted by the petitioner; both children at issue were the biological children of the respondent. The Chalkley court consequently stated the resulting separation of the children from one another arose "as much from the disparity of the children's ages and the circumstances of each of their births as from [the applicable grave risk situation]." [1994] W.W.R. 114, slip op., at 6. The court's holding leaves much doubt the court would have reached the same conclusion had the children been full siblings who were, perhaps, twins who were less than one year younger than their elder brother. Such is the familial situation in the instant case. Because the Chalkley court specifically instructed that the age gap and biological disparity were decisive factors in separating the children, the Chalkley rationale is simply inapplicable to the instant case because the relevant factual considerations in Chalkley are not present here. Thus, the Court would be in error were it to apply Chalkley to the instant case.
As such, the Court may properly decline to return I.Y.L. and S.M.L. To return only two siblings would be detrimental to all three. The Court will not subject the children to such a fate.
The Court cannot refrain from remarking that the instant case is reminiscent of the case before King Solomon. 1 Kings 3:16-28. King Solomon entrusted a baby to the woman who selflessly agreed to give up the baby to spare the child an unfortunate fate, whereas another woman was willing to have the baby literally split apart. Here, respondent is willing to part with her children to keep all three children together; petitioner would have the Court split them apart. (Compare Respondent's Post-Hearing Brief, Doc. 86, at 11 ("Respondent wants the three children kept together, whether it is in the U.S. or Turkey. They need each other.") with Petitioner's Post-Hearing Brief, Doc. 87, at 13 ("[I]t is Father's preference that in the case that it is decided that a 'grave risk' exception applies to some of the Children, the other children nevertheless be returned to Turkey.")). To separate the three children, as petitioner would have this Court do, would be akin to splitting the baby.
B. Spirit of the Convention
"The Convention is intended to address the situation where parents involved in custody disputes wrongfully take their children across international borders in search of a more sympathetic court. The Convention seeks to do so by restoring the pre-abduction status quo. " Application of Blondin v. Dubois , 78 F.Supp.2d 283, 293 (S.D.N.Y. 2000) (emphasis added); accord Silverman , 267 F.3d at 791-92 ("The primary purpose of the Convention is 'to restore the status quo ante and to deter parents from crossing international boundaries in search of a more sympathetic court.' " (quoting Rydder , 49 F.3d at 372 )). See also Antunez-Fernandes v. Connors-Fernandes , 259 F.Supp.2d 800, 809 (N.D. Iowa 2003) (same). "The Convention should not be interpreted to permit a parent to select which country will adjudicate [custodial disputes] by bringing the child to a different country, in violation of a ne exeat right." Abbott , 560 U.S. at 20-21, 130 S.Ct. 1983.
When drafting the Convention, the drafters contemplated a situation wherein one individual was the primary caregiver for a child and a second individual wrongfully removed the child from the former's care. Pérez-Vera Report, at ¶¶ 24, 115-16. However, petitioner was not the primary caregiver for the children. Petitioner was not a caregiver for the children at all. At most, petitioner provided some financial *899 support for the children. The children did not reside with petitioner-aside from when I.Y.L. was very young and had not yet gone to live in Istanbul-and petitioner did not undertake to provide any physical care for the children. Notably, petitioner still has not been trained on providing home dialysis for E.M.L., which further shows he cannot be considered the children's primary caretaker.
Although the Court has found petitioner did not exercise his custodial rights prior to the children's removal to the United States, to the extent petitioner did exercise his rights or maintained contact with his children, he did so primarily via Internet. While both parties and the children were still in Turkey, but after petitioner and respondent had separated, petitioner communicated with respondent via email, sent respondent video attachments for the children to view, and communicated with respondent's father on at least one occasion via telephone to discuss a variety of issues, including whether petitioner was a suitable father. (See Ex. AO). The primary topics of discussion during these email communications were the couple's failing marriage, how to resolve the marital difficulties, and the parties' children. The parties discussed E.M.L.'s medical condition extensively.
The twins were born in Istanbul in February 2016. (Doc. 57, at 6). Following their births, petitioner remained in Istanbul for more than a month, visited the twins at the NICU daily, and met with the twins' doctors to discuss their medical conditions. (Id. , at 6-7). During this same time period after the twins were born, petitioner visited with I.Y.L. for four to five hours daily, until a conflict with respondent led to these visits being terminated. (Id. , at 7). On March 22, 2016, following petitioner's one-month stay in Istanbul, petitioner returned to his home in Gokceada and did not see the children again until June 9, 2016. (Id. , at 7-8). Petitioner visited the children only once between March 22, 2016, and the children's departure from Turkey on August 13, 2016; from June 9 through June 11, petitioner spent eight to nine hours with the children on each of these three days. (Id. ).
Petitioner contends he was unable to see the children because respondent impeded his repeated attempts to see the children and otherwise served as a barrier between petitioner and the visitation that otherwise would have occurred. However, the trial Court, which is best situated to determine issues of credibility, remains unconvinced that the lack of visitation was respondent's fault.[14] Rather, the testimony and evidence provided lead the Court to conclude that petitioner's focus on repairing his house and the ordinary events of life precluded petitioner from traveling to Istanbul to see his children. The Court has found no evidence to support petitioner's assertion that he did not regularly see his children due to respondent's improper behavior.
After the children were removed from Turkey, petitioner communicated with respondent via email, sent respondent video attachments for the children to view, and Skyped with the children on numerous occasions. Following the children's removal *900 from Turkey, petitioner had just as little contact with his children, in the same form, as he had when the children were living in Istanbul. Likewise, petitioner's communications with respondent regarding the children were in the same form following respondent's relocation to America as they were while respondent was living in Istanbul. If anything, petitioner may have received more frequent communications than he had received while respondent was living in Istanbul.
The evidence shows petitioner's relationship with his children is the same now as it was when the children lived in Turkey. Petitioner's primary means of communication then was email, just as it is now. Petitioner communicated with his children primarily by sending them videos of himself, just as he does now. Petitioner received photographs and videos of his children when they lived in Istanbul, just as he does now. Petitioner was not physically present in his children's lives for the last two months they lived in Istanbul, nor does the evidence suggest he would have devoted more time to being physically present with his children had they remained in Turkey. Thus, petitioner has not been deprived of anything he enjoyed or would have enjoyed had the children remained in Turkey. Petitioner took it upon himself to not be a physical presence in his children's lives and, thus, the children's removal to America did not materially alter the status quo. Petitioner has offered to travel to America in the event E.M.L.'s surgery takes place in Iowa, which indicates a willingness and ability for petitioner to make the trip. As a United States citizen, there is nothing preventing petitioner from traveling to America to visit his children or from relocating to America permanently.[15] Petitioner has not claimed he lacks the funds for such travel. Yet, he has made no visits for the purpose of seeing the children. The status quo now is exactly as it was prior to the children's removal to America. Thus, the spirit of the Convention, being to "restore the status quo ante ," has not been upset. Rydder , 49 F.3d at 372.
Rather, if the children were to be returned to Turkey, the status quo would be altered. This is not in line with the spirit of the Convention. (Id. ). Given the current unavailability of travel visas to American citizens, respondent is unable to travel to Turkey. Even if Turkey were to resume issuing travel visas to American citizens in the near future, Turkey has the sole authority to determine whether to issue visas and may modify its policy at any time. Thus, respondent's ability to freely enter Turkey is not a foregone conclusion. Petitioner is the children's only other guardian and the only other individual vested with custodial rights and responsibilities. Therefore, if the children were returned to Turkey, petitioner would be the only guardian available to care for the children.
Even though this Court is not able to determine custody issues-and this Court will not determine the legal issue of custody-it would be equally improper for the Court not to recognize that, if the Court *901 were to order the return of any or all of the children to Turkey, the de facto resolution would be petitioner receiving full physical custody of the children. Even though this would not be the de jure resolution, because respondent would be unable to travel to Turkey, respondent would not be able to maintain a physical presence in her children's lives, at least for the foreseeable future. Therefore, respondent would not be capable of exercising physical custody over the children. As shown above, petitioner maintained a physical presence in all three children's lives for only one month, for reasons of his own making. To order the return of any or all of the children would be to grant petitioner de facto physical custody over children for whom he has never before exercise physical custody. Petitioner may not decline to exercise his physical rights of custody then later argue that, under the Hague Convention, he is entitled to exercise those very rights he originally declined. That would not restore the status quo ante and would be inconsistent with the spirit of the Convention.
Finally, the Convention is intended to combat crossing international borders in search of a more favorable forum to resolve custody disputes. Abbott , 560 U.S. at 20-21, 130 S.Ct. 1983 ; Silverman , 267 F.3d at 791-92. Here, however, respondent clearly has not come to the United States in search of a more favorable forum. Respondent filed for divorce in Turkey. The Turkish Family Court retains jurisdiction over the divorce proceedings. The Turkish court likewise retains jurisdiction over any custody disputes. Respondent has not filed for custody in any American court, nor has respondent asked this Court to determine issues of custody. In fact, respondent is very actively litigating the Turkish family law case and has made no indication she intends to do otherwise. There is simply no evidence respondent removed the children to the United States to attain some legal benefit in terms of custodial rights. Accordingly, the Court need not be concerned that by declining to remove the children to Turkey, the Court is improperly allowing respondent to realize a benefit by pursuing a custody claim in a more favorable court. This purpose of the Convention is simply inapplicable here.
VIII. CONCLUSION
For the foregoing reasons, petitioner's Hague petition is hereby denied. The Court declines to remove the subject children, I.Y.L., E.M.L., and S.M.L., back to Turkey, the country of their habitual residence. The Clerk of Court is hereby directed to release the passports for all three children-I.Y.L., S.M.L., and E.M.L.-to the custody of respondent.
IT IS SO ORDERED this 1st day of November, 2017.

The Answer was filed prior to the Complaint because the Court permitted petitioner to amend his First Amended Complaint (Doc. 13) to correct typographical errors but did not require respondent to refile her Answer. (See Doc. 55, at 1).

Although petitioner did not comply with 8 C.F.R. § 1003.33's requirement that translated documents be accompanied by a translator's certification, respondent did not object to the admission of the translated exhibits, and the Court declines to consider the objection sua sponte.

Peritonitis is an inflammation of the tissue lining the inner wall of the abdomen. It can be a complication of ESRD, can be very serious, and requires medical treatment.

Although respondent asserts the grave risk affirmative defense with respect to all three children, the discussion of this affirmative defense centers around E.M.L. and her unique medical needs.

Respondent's Turkish divorce attorney appeared as a witness for the respondent. The Turkish attorney required an interpreter. Shortly into questioning, the Petitioner claimed the translation was erroneous. The retained interpreter admitted he was proficient, but not fluent, in Turkish. Both petitioner and respondent were fluent in Turkish, and each agreed the interpreter was doing a poor job of interpreting. Petitioner offered to serve as an interpreter. Respondent expressly agreed to this solution. The Court administered the interpreter's oath to Petition and he then served as the interpreter during questioning by respondent and the Court; Petitioner declined to cross-examine the lawyer. Notably, several times throughout the witness's testimony, respondent expressed assent to petitioner's interpretation and agreed with petitioner's word choice on several occasions when those words did not have a perfect English translation.

Petitioner attempts to argue that six of his custodial rights were violated by the children's removal. As will be shown, infra , however, four of the six alleged rights were actually obligations imposed on parents under Turkish law and, thus, cannot stand as a basis for a wrongful removal or retention under Article 3 of the Hague Convention.

Elisa Pérez-Vera was the official Hague Conference reporter for the Hague Convention. "Her explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." 51 Fed. Reg. 10,494, 10,503 (1986) ; Abbott v. Abbott , 560 U.S. 1, 19-20, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010) ; Blondin v. Dubois , 78 F.Supp.2d 283, 294 n.12 (S.D.N.Y. 2000).

Because establishment of this element is petitioner's burden, petitioner is likewise tasked with presenting the Court with evidence indicating the meaning of the term "house," as used in the Turkish Civil Code. In the absence of any contrary evidence, the Court reads "house," as used in the Turkish Civil Code to indicate the house of the parents. Here, because petitioner is the parent challenging the children's removal and the parties did not reside together at all material times, the Court will give petitioner the benefit of reading "house" to mean the parties' marital dwelling in Gokceada.

The Court is aware that petitioner and respondent arranged a visitation schedule for October 19, 2017, the day after the evidentiary hearing for the instant case took place. However, this visitation was incidental to petitioner's necessary presence before the Court. Petitioner did not travel to Iowa specifically to see the children. The Court's knowledge is limited to those facts relayed; the Court has been presented with no evidence on whether the schedule was adhered to or how the visit was received by either party or by the children.

The Court stands firmly convicted in its ruling that petitioner did not establish a prima facie case. The Court also recognizes, however, that this is a case of first impression in several respects and that this case, therefore, may find itself the subject of future scrutiny.

Article 12 of the Hague Convention states that a court is bound to return a child where proceedings under the Hague Convention were commenced more than one year from the date of removal, unless it is demonstrated by a preponderance of the evidence the child is "now settled in its new environment." However, the wrongful removal here occurred on August 13, 2016, and petitioner filed this action on May 12, 2017. (See Doc. 4). Thus, the Article 12 affirmative defense does not apply here.

Petitioner submitted Doc. 88 as an untimely supplemental brief. Doc. 88 appears to show an email sent by petitioner to Turkey's Ministry of Foreign Affairs and the Ministry's response to petitioner's email. Both emails seem to have originally been transmitted in Turkish. Petitioner has provided a translation to both emails, however, petitioner has not included a translator's certification as required by 8 C.F.R. § 1003.33. Absent such a certification, the Court is not able to conclude the English translation is an accurate representation of the original emails. The translation could even have been made by petitioner himself. As such, the Court is not willing to rely on the emails to find in favor of petitioner on any issue, material or otherwise. The Court previously disregarded this certification failure, but there the respondent had a chance to object to the translation. She has had no opportunity to do so in this case.

The remaining use of "child" is preceded by "any" and merely relates to the determination of when the Convention applies to a child based on the child's habitual residence. The use of "child" in this instance does not alter the interpretation of the Convention as to this issue.

"Determinations of credibility rest with the trier of fact and not with the appellate court." United States v. Scott , 485 F.2d 576, 577 (8th Cir. 1973). Credibility can be measured by, inter alia , demeanor and "how reasonable, or how improbable ... explanations are." Miller-El v. Cockrell , 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). An appellate court is not positioned as well as a trial court to decide issues of fact and, specifically, questions of credibility, because appellate courts review only transcripts which frequently cannot reveal a witness's demeanor. (Id. ) Thus, "[trial] court findings of fact are to be accorded the presumption of correctness." Wainwright v. Witt , 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

The Court notes that although petitioner has exhibited a clear desire to live in Turkey and to forego a number of modern luxuries, petitioner is not forced to live such a life. The Court respects petitioner's right to live in this fashion but also notes that petitioner attended Columbia University in New York, obtained a four-year degree in software engineering, has worked in the private American sector for major companies where he earned a good salary, and has dual citizenship with both Turkey and the United States. Petitioner has not asserted an inability to find work in America or otherwise claimed an inability to live in America. Respondent, on the other hand, is an American citizen only, and would face legal challenges in returning to Turkey and, possibly, in attempting to establish a permanent domicile in Turkey.